IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Dominguez Mendoza, | No. CV-13-00258-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| City of Peoria, et al., | |
| Defendants. | |

At approximately 9:00 p.m., on February 23, 2011, the Special Weapons and Tactics Team ("SWAT") of the Peoria Police Department ("PPD"), began executing a search warrant at the home of plaintiff David Dominguez Mendoza and his mother Lydia Dominguez. That search warrant was in connection with a December 13, 2010, residential burglary in which plaintiff Mendoza was a suspect. Defendant Aaron Brewer is a PPD officer trained in canine handling and was one of eight SWAT operators deployed that night to Plaintiff's residence. Officer Brewer was accompanied by a PPD canine, Havoc. During the course of executing the search warrant, Officer Brewer commanded Havoc to bite plaintiff Mendoza about ten times, resulting in severe injuries to his left forearm.

Plaintiff Mendoza commenced this 42 U.S.C. § 1983 lawsuit alleging violations of the Fourth Amendment, as well as several state law tort claims. Two Defendants remain -- the City of Peoria and Officer Brewer, sued only in his individual capacity. Currently pending before the Court are four motions. In the first, Brewer is seeking summary judgment on the basis of qualified immunity, and the City is seeking summary judgment

arguing that the "Bite and Hold" methodology is constitutional (Doc. 102).  The City also is seeking summary judgment on the state law tort claims.  In their second motion (Doc. 104), Defendants are moving to exclude certain opinions offered by Plaintiff's "experts.[1]" Plaintiff is cross-moving for partial summary judgment on the issue of liability only (Doc. 106),[2] claiming that defendant Brewer used excessive force in the manner in which he deployed Havoc during the execution of the search warrant.  Plaintiff also is moving to exclude Defendants' canine "expert" as a witness in this case. (Docs. 105 and 108[3]).

**I.  Motions to Exclude**[4]

Potentially, any rulings on the motions to exclude could impact the scope of this summary judgment record.  Therefore, the Court will consider these motions first.

Defendants are seeking to exclude "certain opinions offered by Roger Clark, Plaintiff['s] police practices expert, and Ernest Burwell, his canine expert."  Defs.' Mot. (Doc. 104) at 1:25-2:2.  Additionally, Defendants are seeking to exclude "all of the testimony offered by Thomas McKinnon, [Plaintiff's] economist[,]" who prepared an Earning Capacity Valuation Report  (*Id.* at 2:2-3).

The crux of the reports of Messrs. Clark and Burwell is that the use of Havoc constituted excessive force.  Defendants assert that the opinions of Messrs. Clarke and Burwell should be excluded because they are speculative, improperly based upon credibility determinations, and are an impermissible attempt by Plaintiff to employ expert opinions to prove issues of law.  The defendants are moving to exclude the testimony of

---

[1]    The Court is using "expert" generically; it is not at this time making any determination as to whether any of the individuals mentioned herein eventually will qualify as experts under the applicable legal standards.

[2]    For brevity, throughout the Court will refer to this as a summary judgment motion, fully recognizing that Plaintiff is seeking only partial summary judgment.

[3]    These filings are duplicative.  Therefore, the Court will cite only to the first filed.

[4]    In its discretion, the Court denies the parties' request for oral argument as it would not aid the decisional process. *See* Fed.R.Civ.P. 78(b); LRCiv 7.2(f); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

Plaintiff's economist for lack of foundation.

Plaintiff, in turn, is moving to exclude the testimony of Brad Smith, whom Defendants have retained to testify as to the use of force in this case. Plaintiff asserts that the opinions which Mr. Smith will be proffering at trial are "100% speculative" and thus not "'based on sufficient facts or data[,]'" as Fed.R.Evid. 702(b) mandates. Pl.'s Mot. (Doc. 105) at 2:10; and at 2:5-6 (quoting Fed.R.Evid. 702(b)) (emphasis omitted).

At this stage, the Court need not delve into the merits of Defendants' motions to exclude. In his summary judgment motion, plaintiff Mendoza is relying upon two excerpts from Mr. Clark's deposition. In the first, Mr. Clark testified as to other options ostensibly available to defendant Brewer and the other officers in executing the search warrant. *See* Mot. (Doc. 106) at 7:1-21 (citation omitted). In the second, Mr. Clark further opined that the shed was the only place to hide in the Mendoza backyard. *See id.* at 8:8-10 (citation omitted). Neither of those opinions is among the five which Defendants are moving to exclude, however. Thus, because none of the five Clark opinions, which Defendants are seeking to exclude, form the basis for Plaintiff's summary judgment motion, at this time it is not necessary to decide whether to exclude any of the six opinions Mr. Clark's report lists.

For substantially the same reason, at this juncture the Court also declines to decide whether to exclude any of the opinions set forth in the reports of Messrs. Burwell and McKinnon. Defendants, not Plaintiff, are relying upon portions of Mr. Burwell's deposition. *See* Defs.' Resp. PSF (Doc. 113) at 12:22-14:3. But, again, none of the parties are expressly relying upon Mr. Burwell's report in connection with the cross-motions for summary judgment. Plaintiff also is not relying on Dr. McKinnon's report. This is understandable given that his report goes to the issue of damages, if any, and Plaintiff limits his summary judgment motion to the issue of liability.

Likewise, Plaintiff's motion to exclude Defendants' canine expert, Mr. Smith, "as an expert witness in this case[]" is premature. *See* Pl.'s Mot. (Doc. 105) at 1:26-27. This motion is premature because the Defendants are not relying upon any of Mr. Smith's

opinions to support their summary judgment motion.

Consequently, the Court denies without prejudice to renew the parties' motions to exclude.[5]  In so doing, the Court observes that even a quick perusal of these motions demonstrates that, for the most part, they are riddled with credibility issues, which typically are more appropriately left for trial.

**II.  Cross Motions for Summary Judgment**

      **A.  Background**

            **1.  Procedural**

Since the filing of this lawsuit the parties and the claims have been narrowed. Originally, plaintiff Mendoza's minor son also was a plaintiff in this action.  Pursuant to the parties' stipulation, the Court previously dismissed his claim without prejudice.  This leaves David Dominguez Mendoza as the only remaining plaintiff.

The number of defendants has also been reduced.  Because plaintiff Mendoza is not objecting to dismissal of defendant Luis Aponte, a Sergeant with the PPD, the Court grants summary judgment in his favor.  *See*  Pl.'s Resp. (Doc. 109) at 2, n. 2.  Jane Doe Brewer and Jane Doe Aponte were named in the caption of the Second Amended Complaint ("SAC"), but the SAC does not include any allegations against them.  Neither of these fictitious defendants was served.  Therefore, the Court *sua sponte* dismisses this action against both Jane Doe defendants.

The claims have been narrowed by stipulation as well.  Pursuant to a joint stipulation, the battery, negligence and gross negligence claims against defendants Brewer and Aponte have been dismissed without prejudice.  That dismissal expressly provided that it shall not "affect in anyway whatsoever" those tort claims against the City, however.  Stip. (Doc. 15) at 2:6.

In his section 1983 claim against defendant Brewer, Plaintiff alleges that when executing the search warrant at his residence, Brewer's deployment of Havoc constituted

---

      [5]      The Court is aware that the parties filed these motions to exclude to comply with the scheduling order of the Honorable Neil Wake, to whom this case was previously assigned.

excessive force in violation of the Fourth Amendment.  Plaintiff Mendoza has a different theory of section 1983 liability against the City.  He alleges that because the City, regardless of circumstances, only trains its officers to use the "Bite and Hold[,]" as opposed to the "Bark and Hold" methodology, with its police canines, this, too, amounts to a Fourth Amendment violation.  *See generally* Second Amended Complaint ("SAC") (Doc. 7) at 13:13–14:28.  Plaintiff further alleges state law tort claims for battery, negligence and gross negligence against the City.

### 2. Factual[6]

Given that there "are no per se rules in the Fourth Amendment excessive force context[,]" *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (internal quotation marks, citation and footnote omitted), the Supreme Court has instructed that "in the end [courts] must still slosh [their] way through the factbound morass of 'reasonableness." *Scott v. Harris*, 550 U.S. 372, 383 (2007).  In so doing, this Court, as it must, will "give 'careful attention to the facts and circumstances of [this] particular case[.]'" *See Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Graham v. Connor* 490 U.S. 386, 396 (1989)).  Preliminarily, the Court will provide an overview of what occurred on February 23, 2011, when the PPD executed a search warrant on plaintiff Mendoza's residence.  Then, as part of its multi-factor analysis of the excessive force claim, the Court will delve more deeply into the facts pertaining to each factor.

The facts regarding the February 23, 2011 encounter between plaintiff Mendoza and Officer Brewer and others from the PPD are undisputed, with a few critical

---

[6]     The Court appreciates counsels' desire to vigorously represent their clients. That vigorous representation should not, however, include unsupported factual assertions, whether in a statement of facts or in a memorandum of law.  For example, Plaintiff states that he "did not recognize those individuals as police officers and *instead believed that they were private individuals attempting to impersonate the police to no good end.*" PSF (Doc. 107) at 3, ¶ 10 (emphasis added) (citations omitted).   Not one of the three cited exhibits establishes the italicized phrase.  Another example is Defendants' assertion that "in the split second that Plaintiff escalated the situation, Havoc became the closest and most effective means of control."  Defs.' Reply (Doc. 112) at 14:1-2 (citation omitted). The given cite has nothing to do with that statement though. Rather, it states, "Burwell believes that if Plaintiff had not come out of the shed, he would not have been bitten." Defs.' Resp. PSF (Doc. 113) at 14, ¶ 55 (citation omitted).  These types of misstatements tend to distract rather than add to a party's arguments.

exceptions.[7]

On December 13, 2010, the PPD responded to a residential burglary.  The stolen items included a 515 pound safe containing $21,000.00 in cash and a Chase Credit card.  Jewelry valued at $10,000.00 was also stolen, along with $5,100.00 in electronic equipment.    Slightly more than two months later, on February 23, 2011, Mendoza's former girlfriend, Ursula McGehee, was arrested and booked for theft and fraudulent use of a credit card in connection with the December 13th burglary.  While being interviewed, Ms. McGehee informed the PPD that Plaintiff was also involved in that burglary, and that she would cooperate with the PPD to assist in locating Plaintiff's residence.

At 7:06 p.m. on February 23, 2011, "satisfied that there [was] probable cause to believe that" Plaintiff "committed . . . the crime[] of residential burglary in the second degree[,]" a Commissioner of the Maricopa County Superior Court issued a search warrant, but not an arrest warrant.  Defs.' Statement of Facts ("DSF") (Doc. 103), exh. D (Doc. 103-1) at 36.[8]  That warrant authorized a search of Plaintiff's residence "[i]n the day time (excluding the time period between 10:00 p.m. and 6:30 a.m.)" *Id.* at 39.   Prior to the execution of the search warrant, the PPD was aware that Plaintiff's driver's license had been revoked and he was on probation for driving while under the influence and for possession of drug paraphernalia.  In fact, earlier in the day on February 23, 2011, Plaintiff failed to appear for an appointment with his probation officer.

Before executing the search warrant, Sergeant Aponte, a SWAT supervisor, met with his team and some property crimes detectives for a mission briefing.  Shortly after 8:00 p.m., on February 23, 2011, a PPD officer and detective began a surveillance of the Mendoza residence.  At approximately 8:30 p.m., an individual matching Plaintiff's description exited the residence and drove away in a Chevrolet Impala.  After being

---

[7]    Therefore, generally citations to the fairly voluminous record are limited to those instances where the facts are in dispute.

[8]    For uniformity and ease of reference, all citations to page numbers of docketed items are to the page assigned by the Court's Case Management and Electronic Case Filing system, including deposition cites.

- 6 -

advised of plaintiff Mendoza's departure, from the briefing room Sergeant Aponte directed that if possible, a traffic stop should be conducted on him and an attempt made to take Mendoza into custody.

Following that directive, a traffic stop of plaintiff Mendoza was attempted a short distance from his residence.  Instead of responding to the red and blue emergency lights, which had been activated on a PPD undercover vehicle, Mendoza kept driving.  When questioned as to why he did not stop, Mendoza answered that he "didn't know who it was[,]" and he felt as though he had done nothing wrong.  Pl.'s Statement of Facts ("PSF") (Doc. 107), exh. C (Doc. 107-1) at 19.  Continuing to drive, Mendoza made two quick right turns, proceeding into a Home Depot parking lot, accelerating his rate of speed to approximately 50 miles per hour.  Given the speed at which Mendoza was driving, the erratic nature of his driving and his failure to stop for the emergency lights, the traffic stop efforts were discontinued.

Approximately one minute later, plaintiff Mendoza returned to the area of his residence, stopping behind a detective's unmarked vehicle. After exiting his car, Plaintiff immediately began running towards his residence. While running across a green belt, he tripped, dropping several items, including his cell phone.  Plaintiff then entered his house via the front door, walked through and exited through the back door to the backyard, where he hid in a storage shed located at the end of a narrow walkway.

After learning of the foregoing, Sergeant Aponte, who was in the PPD patrol briefing room, proceeded with his SWAT briefing, making assignments to the SWAT operators and the Property Crimes Unit detective.  Sergeant Aponte, who does not have any specialized canine training, contacted canine officers who did − one of whom was defendant Brewer.  Sergeant Aponte requested the assistance of defendant Brewer and his fellow officer in executing the search warrant on the Mendoza residence.  When Aponte sought their assistance, those two officers were in their weekly K-9 training.  In the meantime, "approximately five minutes after [Plaintiff] ran into [the] house," his mother testified that she went out the front door to look in the driveway a "couple of times."  Pl.'s

Resp. DSF, exh. K (Doc. 110-1) at 3, p. 54:25-55:1. Ms. Dominguez did not "have an answer[]" as to why she did that; she "guess[ed]" that she was "[j]ust . . . double-checking[.]" *Id.* at 55:3-4. Ms. Dominguez further testified that she was looking to see whether her son's car was in the driveway, and it was not. Two of the detectives conducting surveillance observed Ms. Dominguez exit the front door of the residence and looking around three times during the span of roughly 15 minutes. DSF, exh. F (Doc. 103-1) at 47-48.

At about 9:00 p.m., the PPD SWAT team, including Officer Brewer, arrived at the Dominguez/Mendoza residence to serve the search warrant. One of the SWAT officers "loudly banged on the steel security door of Plaintiff's residence at least three times and in a loud voice announced, Police, search warrant, open the door." DSF (Doc. 103) at 5, ¶ 25 (internal quotation marks and citations omitted); *see also* Pl.'s Resp. DSF (Doc. 110) at 3, ¶ 25 ("admitted").

Ms. Dominguez came to the door and informed the officers that no one else was in the house, although an unknown person had run through the house earlier. "With the front door to the residence opened, at least six loud calls were made into the residence stating[,] Peoria Police Department, we have a search warrant, come out with your hands up." DSF (Doc. 103) at 5, ¶ 27 (internal quotation marks and citations omitted); *see also* Pl.'s Resp. DSF (Doc. 110) at 3, ¶ 27 ("admitted"). Those verbal commands, which one of the detectives heard from 50 yards away, were given prior to employing Havoc to assist with clearing the residence. Additionally, Mendoza admitted that "[f]rom his position in the shed, [he] heard . . . verbal commands to surrender[,]" but he "did not follow" those commands, which, again, were given prior to the PPD conducting a search of the residence. (*Id.* at 6, ¶¶ 30-31 (citations omitted)); *see also* Pl.'s Resp. DSF (Doc. 110) at 3, ¶¶ 30-31.

After escorting Ms. Dominguez from the residence, and after receiving "no response from . . . inside of the residence for several minutes," defendant Brewer and Havoc were called to the front of the residence to assist with clearing it. (*Id.* at 6, ¶ 32

(citations omitted)); s*ee also* Pl.'s Resp. DSF at 3, ¶ 32 ("admitted").   From inside the shed, Plaintiff could hear the officers clearing the house; but at no time during that approximately 25 minute process did he surrender.   During the search of the house, no guns of any type were found.  PSF, exh.  A (Doc. -107-1) at 6.  Nor was plaintiff Mendoza found.

So, the SWAT team proceeded to search the backyard, with the assistance of Officer Brewer and Havoc.  Sergeant Aponte describes the back yard as being "pitch dark[.]"  DSF, exh. O (Doc. 103-1) at 91:23-24.  Sergeant Aponte testified that no lights were used upon entering the backyard because "it would have given [thei]r position away[.]"  (*Id.* at 91:24-25)  Sergeant Aponte gave the same justification for not making any kind of announcement upon entering the backyard.  (*Id*. at 91:25-92:2).  It is Plaintiff's recollection though that through a crack in the shed door he could see the officers' flashlights as they entered the backyard.  Pl.'s Resp. DSF, exh. L (Doc. 110-1) at 8.

Throughout the backyard search, Officer Brewer had Havoc on a 30 foot lead or leash.  In the backyard, there was a narrow walkway, approximately three to four feet wide and 25 feet in length.  At the end of that walkway was a metal shed with closed doors.   "Due to the confined space of the walkway, the lack of lighting and the location of the shed, . . . Brewer decided it was safer to have Havoc search the area."  DSF (Doc. 103) at 7, ¶ 44 (citations omitted); Pl.'s Resp. DSF (Doc. 110) at 4, ¶ 44 ("admitted").  Still while on his 30 foot lead, Havoc was sent down the narrow walkway to sniff the shed to see if he could extract any human odor.  From the shed, plaintiff Mendoza was able to see the SWAT team.

In his Incident Report ("IR"), written the day after the execution of the search warrant, Brewer wrote that "[a]s Havoc reached the shed, [he] could feel in the lead that Havoc's behavior began to change indicating he was in odor."  DSF, exh. M (Doc. 103-1) at 81.  Officer Brewer further reported that "[a]t that time, [Mendoza] swung open the doors of the shed without being instructed."  (*Id.*)  At this point, "the area was illuminated

by one of the SWAT Team members and [defendant Brewer] observed [plaintiff] Mendoza squatting just inside the shed and his hands could not be seen." (*Id.*) Officer Brewer wrote, that "[i]t was unknown" whether "Mendoza was armed with a weapon." DSF, exh. M (Doc. 103-1) at 81. Brewer did report that "[d]irectly to the left of [] Mendoza were multiple lawn tools (shovel, hoe and rake)." (*Id*. at 82). Also according to Officer Brewer, "Just outside the shed[,]" in which Plaintiff was hiding, there was a "shovel and a three foot piece of rebar." (*Id*.)

Plaintiff Mendoza admits that "[c]ommands were given for . . . [him] to show his hands[.]" DSF, exh. M (Doc. 103-1) at 82; and exh. K at 25:51-55; *see also* Pl.'s Resp. DSF (Doc. 110) at 4, ¶ 48. Mendoza testified that he opened both shed doors with his hands, on his "own volition[.]" Pl.'s Resp. DSF, exh. L (Doc. 110-1) at 9. During his deposition, Mendoza agreed that after opening the shed, he said, "I'm right here[,]"[9] adding that he said that "[w]ith [his] hands up." (*Id.*)

According to Officer Brewer, plaintiff Mendoza did "not comply[]" with the commands to show his hands. DSF, exh. M (Doc. 103-1) at 82. Therefore, based upon Mendoza's "position, his location[] to the lawn tools, and him not complying, [Brewer] "instructed Havoc to bite . . . Mendoza." (*Id.*) Havoc obeyed.

As can be heard on the simultaneous audio recording, immediately after plaintiff Mendoza was ordered to "Come on out," for roughly 11 seconds Havoc repeatedly was given the order "Fasse," Pl.'s Second SOF, exh. N (Doc. 119) at 1:51-2:02, which means to bite. (*Id.*), exh. P (Doc. 119) at 7. During his deposition, Officer Brewer conceded that he "intentionally and consciously ordered Havoc to bite" plaintiff Mendoza "multiple[]" times -- "ten-plus, probably." PSF, exh. A (Doc. 107-1) at 7. When he instructed Havoc to bite, Brewer was aware that it would hurt, injure and wound Plaintiff. (*Id.* at 5). Havoc twice bit plaintiff Mendoza on his left forearm. DSF, exh. H (Doc. 103-

---

[9]      Audio and video versions of the execution of the search warrant are part of this record. Some but not all parts of the audio are inaudible. Hence, this is not a situation, as in *Scott v. Harris*, 550 U.S. 372 (2007), where one party's version of events was "so utterly discredited[]" by the record videotape, that no reasonable jury could have believed that party. *See id*., at 390 (internal quotation marks and citation omitted).

1) at 63; *see also* Pl.'s Resp. DSF, exh. M (Doc. 110-1) at 11.  After the first bite, Mendoza "threw" Havoc off of him, but Havoc bit him again.  DSF, exh. H (Doc. 103-1) at 63.   Officer Brewer left Havoc "on the bite as . . . Mendoza walked to the[] location[]" of the SWAT team.  (*Id.*, exh. M (Doc. 103-1) at 82.)  As Officer Brewer agreed, during this walk, Havoc was hanging from Mendoza's left forearm.  PSF, exh. A (Doc. 107) at 8.  When he reached that location, Mendoza complied with the order to lay on the ground and he was then taken into custody.  (*Id.*)    At that point, Officer Brewer removed Havoc from Plaintiff's forearm.  (*Id.*)  The PPD immediately contacted the Phoenix Fire Department which arrived and treated Plaintiff's injuries.  Thereafter, plaintiff Mendoza was transported to the hospital for further treatment.  (*Id.*)

None of the items listed on the search warrant were found during the search of the Dominguez/Mendoza residence.  PSF, exh. A (Doc. 107-1) at 6. Following a Use of Force investigation, the PPD found no issues with Officer's use of force and exonerated him.  See Pl.'s Resp. DSF, exh. M (Doc. 110-10) at 22-23.

### B.  Governing Legal Standards

The Court assumes familiarity with what has sometimes been referred to as the *Celotex* trilogy, wherein the Supreme Court clarified and refined the standards for deciding Rule 56 summary judgment motions. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  There is no need to repeat the entire body of summary judgment jurisprudence which has developed since then.  However, given the procedural posture of this case – cross-motions for summary judgment – and because it involves a claim of qualified immunity in the context of an excessive force claim, a few of those standards bear repeating.

Federal Rule of Civil Procedure 56 "is silent as to how the court must analyze simultaneous cross-motions for summary judgment." *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1135 (9th Cir. 2001).  Courts have recognized, however, that "[t]he summary judgment standards do not 'change when the

parties file cross-motions for summary judgment: the court must apply the same standard and rule on each motion independently because the granting of one motion does not necessarily translate into the denial of the other unless . . . the parties rely on the same legal theories and same set of material facts.'" *We are America*, 297 F.R.D. at 381 (quoting *Feezor v. Excel Stockton, LLC*, 2013 WL 2485623, at *2 (E.D.Cal. June 10, 2013) (citing *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010)). Therefore, "when assessing the record to determine whether there is a 'genuine issue for trial,' the court must 'view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in his favor.'" *Oshilaja v. Watterson*, 2007 WL 2903029, at *4 (D.Ariz. Sept. 30, 2007) (quoting, *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) (citation omitted)). "'This is true even though[,]' as here, 'the court is presented with cross-motions for summary judgment[.]'" *Id.* (quoting *High Tech Gays v. Defense Ind. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990) (citation omitted)).

It also bears mentioning that "[t]he criteria of 'genuineness' and materiality' are distinct requirements." *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 916 (9th Cir. 1996) (citing *Anderson*, 477 U.S. at 248). "The requirement that an issue be 'genuine' relates to the quantum of evidence the plaintiff must produce to defeat the defendant's motion for summary judgment." *Id.* "There must be sufficient evidence 'that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S., at 248). "'[T]he materiality determination rests on the substantive law,'" however. *Anderson*, 477 U.S., at 248. So, with respect to plaintiff Mendoza's excessive force claim, the Court must "turn [its] attention to the reasonableness of defendant[] [Brewer's] conduct under the substantive law of *Graham* [*v. Connor*, 490 U.S. 386 (1989)] more fully discussed herein. *See Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012).

Further, "[t]he ordinary framework for deciding motions for summary judgment applies to motions for summary judgment based on official immunity[,]" such as Officer

Brewer's. *See Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) (internal quotation marks and citation omitted). Therefore, Officer Brewer has "the burden of establishing that there is no genuine issue of material fact to be resolved regarding his immunity." *Dupris v. McDonald*, 2012 WL 210722, at *3 (D.Ariz. Jan. 24, 2012) (citing *Moreno*, 431 F.3d at 638), *aff'd on other grounds*, 554 Fed.Appx. 570 (9th Cir.), *cert. denied*, 135 S.Ct. 356 (2014).

Finally, while certainly not dispositive, the Court would be remiss if it did not acknowledge that "'[b]ecause the [excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has "held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."' *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (alternation in original) (internal quotation marks and other citation omitted)); *see also Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (internal quotation marks and citation omitted) (The Ninth Circuit "has often held that in police misconduct cases, summary judgment should only be granted sparingly because such cases often turn on credibility determinations by a jury.")

### C. Fourth Amendment

In Count III of the SAC, Plaintiff Mendoza alleges a cause of action against Officer Brewer in accordance with 42 U.S.C. § 1983. Plaintiff Mendoza alleges that, in violation of his Fourth Amendment right to be free from unreasonable searches and seizures, in executing the search warrant on February 23, 2011, Officer Brewer used excessive and unreasonable force in the manner in which he deployed police canine Havoc. Plaintiff is seeking partial summary judgment as to liability on this particular count.

"Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights. Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating

- 13 -

federal rights elsewhere conferred." *Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014) (internal quotation marks and citations omitted)).   The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." United States Constitution, 4th Amend.  Therefore, as the Supreme Court has long held, "[a] claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2020 (2014) (citing *Graham*, 490 U.S. 386; *Tennessee v. Garner*, 471 U.S. 1 (1985)).

The Fourth Amendment "requires that [a court] examine the objective reasonableness of a particular use of force to determine whether it was indeed excessive." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1090 (9th Cir. 2013) (citing, *Graham*, 490 U.S., at 394–95) (other citation omitted), *cert. denied*, 134 S.Ct. 1292 (2014). "[D]etermining the objective reasonableness of a particular seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Plumhoff*, 134 S.Ct. at 2020 (quoting *Graham*, 490 U.S., at 396 (internal quotation marks omitted)).  "The inquiry requires analyzing the totality of the circumstances." *Id.* (citation omitted).  "The reasonableness of a search or seizure depends 'not only on *when* [it] is made, but also *how* it is carried out.'" *Cameron v. Craig*, 713 F.3d 1012, 1021 (9th Cir. 2013) (quoting *Tennessee*, 471 U.S., at 8) (emphasis added by *Cameron* Court).  "In other words, even when supported by probable cause, a search or seizure may be invalid if carried out in an *un*reasonable fashion." *Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir. 1994) (emphasis in original).

Furthermore, the reasonableness of a particular use of force is "analyze[d] from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Plumhoff*, 134 S.Ct. at 2020 (quoting *Graham*, 490 U.S., at 396).  Courts "thus 'allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

- 14 -

amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham,* 490 U.S., at 396–397). At the same time though, as *Graham* teaches, this Court "cannot consider evidence of which [a defendant] w[as] unaware." *See Glenn*, 673 F.3d at 873 n. 8. It is improper to consider such evidence because "the prohibition against evaluating officers' actions 'with the 20/20 vision of hindsight' cuts both ways." *Id.* (quoting *Graham*, 490 U.S., at 396).

### 1. Nature and Quality of the Intrusion

An excessive force claim involves "balancing the 'nature and quality of the intrusion' against the 'countervailing governmental interests at stake.'" *Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (citing, *Graham*, 490 U.S. at 396). Here, Defendants readily concede "that the amount of force exerted or the length of the bite was significant." Defs.' Mot. (Doc. 102) at 9:9-10. In fact, they expressly "acknowledge[] that the bite was significant, and don't seek to minimize that element." Defs.' Reply (Doc. 121) at 5:506. Particularly in light of this concession, (but even without), this Court has little difficulty finding that when Havoc bit Mendoza, Havoc was "capable of inflicting significant pain and causing serious injury,' and as such 'are regarded as 'intermediate force' that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests.'" *See  Coles*, 704 F.3d at 628 (quoting *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1161–62 (9th Cir. 2011)). Therefore, plaintiff Mendoza has "established *prima facie* a significant Fourth Amendment intrusion." *See id*. (citation omitted).

### 2. Governmental Interests

The next issue is whether that "degree of intrusion was justified by the governmental interests at stake." *See Green*, 751 F.3d at 1049. "While a court (or jury) may 'look to whatever specific factors may be appropriate in a particular case,' *Franklin*, 31 F.3d at 876, the Supreme Court has articulated three factors that courts should typically consider: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is

actively resisting arrest or attempting to evade arrest by flight." *Cameron*, 713 F.3d at 1021 (citing *Graham*, 490 U.S. at 396). "Where these interests do not support a need for force, *any* force used is constitutionally unreasonable." *Green*, 751 F.3d at 1049 (internal quotation marks and citations omitted) (emphasis added by *Green* Court).

"*Graham* provides a non-exhaustive list of factors to consider in determining the governmental interests at stake[.]" *Gravelet-Blondin*, 728 F.3d at 1091. Therefore, "[a]lso relevant to the excessive force inquiry is what other tactics if any were available to effect the arrest." *Green*, 751 F.3d at 1050 (internal quotation marks and citation omitted); *see also Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (citation omitted) ("an additional factor that" courts "may consider" under *Graham* "is the availability of alternative methods of capturing or subduing a suspect[]"). Additionally, "'the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test.'" *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001) (reasoning that the absence of warning made use of force more unreasonable under the circumstances)); *cf. Forrester v. City of San Diego*, 25 F.3d 804 (9th Cir. 1994) (holding that use of force was not unreasonable, in part because protesters were given warning and instructions on how to comply before force was applied)).

These other factors "do not merely present additional items to consider during a multi-factor test[.]" *Hulstedt v. City of Scottsdale*, 884 F.Supp.2d 972, 991 (D.Ariz. 2012). That is because, "at its most basic, *Graham* asks a court to determine whether an officer's actions were reasonable, and 'the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.'" *Id.* (quoting *Graham*, 490 U.S. at 396) (other citation omitted). Accordingly, in applying *Graham*'s "holistic test," this Court will consider the traditional *Graham* factors in "tandem" with the other non-traditional factors. *Id.* at 992. Likewise, "[t]he *Graham* factors will . . . not be applied in a vacuum, but with an eye towards how they relate to each other, and how they relate to the underlying question of whether a reasonable officer in" defendant

- 16 -

Brewer's position would  have deployed Havoc in the manner in which he did.  *See id.* at 991.

### a.  Severity of Crimes?

Defendant Brewer baldly asserts[10] that on February 23, 2011, "Plaintiff was wanted not only for a misdemeanor traffic infraction (failure to stop for police), but a judge had found probable cause that [Plaintiff] was a suspect in a class three felony (burglary)[,]" which he characterizes as a "serious felony[.]"  Defs.' Mot. (Doc. 102) at 9:20; and at 10:2.  Brewer therefore contends that the first *Graham* factor weighs in his favor because "[t]he government has not only 'an undeniable legitimate interest in apprehending criminal suspects[,]' . . . but also a 'strong interest in solving crimes[.]'" (*Id.* at 10:2; and at 9:22-10:1) (quoting *Miller*, 340 F.3d at 964) (other citation omitted).  This is the sum total of defendant Brewer's severity of the crime argument.

Disregarding the misdemeanor traffic infraction and the surrounding circumstances, plaintiff Mendoza responds by focusing exclusively on the felony burglary.  Plaintiff characterizes it as a "stale" crime, having been committed approximately two and a half months prior to execution of the search warrant.   Pl.'s Resp. (Doc. 109) at 6:21 (emphasis omitted); *see also* Pl.'s Mot. (Doc. 106) at 11:18 (emphasis omitted).  This passage of time, according to Plaintiff, is "significant because it means that the PPD was not presented with an exigent circumstance, such as armed suspects fleeing the commission of a felony."  Pl.'s Mot. (Doc. 106) at 11:25-26 (citation omitted).  Furthermore, Plaintiff repeatedly stresses that the burglary was a property

---

[10]    Bald factual assertions are the hallmark of Defendants' summary judgment motion.  Directly contravening LRCiv 56.1 Defendants' summary judgment motion contains no cites whatsoever to the record.  LRCiv 56.1(e) requires, in pertinent part, that a "[m]emoranda of law . . . *must* include citations to the specific paragraph in the statement of facts that supports assertions made in the memoranda regarding any material fact on which the party relies in support of or in opposition to the motion."  LRCiv. 56.1(e) (emphasis added).

The Court realizes that Defendants' reply does contain record cites.  The cursory manner in which they are presented, is less than helpful, as will become apparent.

crime which did not involve violence or a weapon,[11] and that the warrant was to search his property, not to arrest him.  Thus, Plaintiff argues that because the crime being investigated was a "stale," non-violent property crime, nothing about it "suggest[s] the [he] posed a danger to anyone[.]"  (*Id.* at 8:17-18).

Expanding upon his initial terse argument as to the first *Graham* factor, defendant Brewer counters that although the burglary occurred in December 2010, it was not until earlier in the day on February 23, 2011, (the search warrant execution date) that Plaintiff's former girlfriend implicated him in the burglary.  *See* DSF, exh. B (Doc. 103-1) thereto at 21.  Moreover, because plaintiff Mendoza did not stop his car when signaled to do so by the PPD, defendant Brewer contends that an arrest warrant was unnecessary.  Brewer recognizes that the underlying crime, a felony residential burglary, "may not have initially suggested dangerousness[.]"  Defs.' Reply (Doc. 121) at 6:9.   From Officer Brewer's perspective, however, the situation changed based upon plaintiff Mendoza's actions on February 23, 2011.

More specifically, Plaintiff did not stop his vehicle in response to the PPD emergency lights.  DSF (Doc. 103) at 3, ¶ 13; Pl.'s Resp. DSF (Doc. 110) at 2, ¶¶13.  Instead, he continued driving, making two quick  turns and accelerating through a Home Depot parking lot at 50 miles per hour, with the PPD in pursuit.  (*Id.*); *see also* DSF, exh. H (Doc. 103-1) at 127:5-18).  The speed at which Plaintiff was driving, the "erratic" manner in which he was driving, "and his failure to stop for [PPD] emergency lights," resulted in the PPD's discontinuation of its efforts to conduct a traffic stop of Plaintiff.  (*Id.* at 4, ¶ 14); Pl.'s Resp. DSF (Doc. 110) at 2, ¶ 14).  After returning to the area of his residence, Plaintiff abandoned his car,  ran toward his house,  then ran through the house and hid in the backyard shed.  (*Id.* at 4, ¶¶ 16; 19; and 21); Pl.'s Resp. DSF (Doc. 110) at 2, ¶¶ 16 and 19; at 3, ¶ 21).  Defendant Brewer argues that these undisputed facts, coupled with the search warrant for Plaintiff's residence in connection with a felony

---

[11] "Some type of boring tool" was used to gain entrance to the burgled home, however.  DSF, exh. A (Doc. 103-1) at 9.

burglary, "justifie[d] [their] use of force under the first prong of *Graham*." Defs.' Resp. (Doc. 112) at 8:16-17.

Plaintiff's staleness argument carries no weight with the Court, either legally or factually. First of all, Plaintiff provides no legal support for his argument that the "staleness" of the crime militates against a finding of severity.[12] Second, it is hard to conceive of how the residential burglary, occurring only ten weeks earlier, could be deemed "stale." This is especially so given that earlier on February 23, 2011, the day the PPD executed the search warrant, Plaintiff's former girlfriend, Ursula McGehee, was arrested and booked for theft and fraudulent use of a credit card. DSF, exh. B (Doc. 103-1) at 21. During an interview with the PPD on that same day, Ms. McGehee provided a lead which until then had been missing. She informed the PPD that plaintiff Mendoza was involved with her in the earlier residential burglary, and she indicated that she would cooperate by showing the PPD where Plaintiff resided. (*Id.*, exh. C (Doc. 103-1) at 27). After Ms. McGehee assisted the PPD in locating Plaintiff's residence, at 6:40 p.m. on February 23rd, the PPD sought a search warrant for it. (*Id.*, exh. B (Doc. 103-1) at 20). Consequently, even if the relative "staleness" of a crime somehow mitigates its severity, on this record, the December 10, 2010 burglary was not stale.

It necessarily follows that the Court finds no merit to Plaintiff's suggestion that the purported staleness of the burglary equates to a lack of exigent circumstances. Further undermining Plaintiff's suggestion that no exigent circumstances[13] existed are the undisputed facts previously outlined, showing that Plaintiff did not stop his vehicle in response to PPD emergency lights. Instead, driving erratically, he drove through a Home Depot parking lot at 50 miles per hour, kept going, and eventually abandoned his car,

---

[12]   The Court's independent research, admittedly not exhaustive, revealed none.

[13]   There are a variety of "exigent circumstances" which provide exceptions to the Fourth Amendment's warrant requirement. *See generally Missouri v. McNelly*, 133 S.Ct. 1552, 1570 (2013) (Roberts, C.J., concurring in part and dissenting in part). The present case does not implicate any of those exceptions, however. Therefore, presumably Plaintiff intended to rely upon "exigent circumstances" as that phrase is used in everyday English language, rather than as a legal term of art.

before fleeing from the PPD on foot.  Eventually, Plaintiff hid from the PPD in a shed in his backyard.  The Court thus agrees with defendant Brewer that the residential burglary cannot be viewed in a vacuum when considering the severity of the crime.

Plaintiff Mendoza's attempt to minimize the severity of the residential burglary because it was a non-violent property crime also is unavailing.  *Chew*, 27 F.3d 1432, is the crux of Plaintiff's argument.  In *Chew*, a police officer released a police canine to apprehend the plaintiff who initially was stopped for a traffic violation.  Later, the traffic officer discovered that there were three outstanding felony warrants for Chew's arrest.  The Ninth Circuit agreed with the district court that those outstanding felony warrants were "not to be taken lightly."  *Chew*, 27 F.3d at 1442.  But because "the record d[id] not reveal the *type* of felony for which Chew was wanted," the Ninth Circuit found the existence of those warrants to be of "limited significance."  *Id*. at 1442 (emphasis in original).

In so finding, the *Chew* Court reasoned that "[a] wide variety of crimes, many of them nonviolent, are classified as felonies."  *Id. Chew*, 27 F.3d at 1442.  Continuing, the Ninth Circuit pointed to the Supreme Court's "observ[ation] that 'while in earlier times the gulf between felonies and the minor offences [sic] was broad and deep, today, the distinction is minor and often arbitrary.'"  *Id.* (quoting *Garner*, 471 U.S., at 14 (internal quotation mark omitted)).  The Supreme Court "added: 'the assumption that a felon is more dangerous than a misdemeanant [is] untenable.'"  *Id.* (quoting *Garner*, 471 U.S., at 14).  Based upon this rationale, the Ninth Circuit concluded that "the existence of three warrants for undetermined crimes – for which Chew had not been tried or convicted – [wa]s . . . not strong justification for the use of dangerous force."  *Id.* (footnote omitted).  Further diminishing the significance of the warrants in *Chew* were the "facts what [he] was completely surrounded by the police, and the prospects for his imminent capture were far greater than are those of the many fleeing suspects who are fleeter than the police officers chasing them."  *Id.*  For these reasons, in *Chew* the Ninth Circuit held that this first *Graham* factor cut in defendants' favor, albeit "only slightly."  *Id.*

As can be seen, *Chew* actually supports defendant Brewer's position – not plaintiff Mendoza's.  In analyzing the severity of the crime, *Chew* did distinguish between violent and non-violent felonies, but in the end, as just shown, that distinction was not dispositive.  Additionally, since the 1994 *Chew* decision, the Ninth Circuit has held that the severity of the crime factor weighs in the government's favor when the crime is a felony, regardless of the type of felony involved.  *Miller*, 340 F.3d 959, is illustrative.  There, the plaintiff was wanted for a misdemeanor traffic infraction and a prior felony, "attempting to flee from police by driving a car with a wanton or willful disregard for the lives of others."  *Id.* at 960.  Rather than focusing on the nature of the felony, the *Miller* Court  reasoned that the government's "undeniable legitimate interest in apprehending criminal suspects, . . . is even stronger when the criminal is, like Miller, suspected of a felony, which is by definition a crime deemed serious by the state."  *Id.* at 964.  Id. (citation omitted).  On this basis, the Ninth Circuit held that the first *Graham* factor "strongly" favored the government.  *Id.*

More recently, in *Coles*, 704 F.3d 624,  agreeing with the district court,  the Ninth Circuit held that where "[t]he officers had reason to believe that Coles had stolen a car, a felony-grade offense," the severity of the crime factor "weighed in favor of defendants." *Id.*  at 628-629 (footnote and citation omitted).  Again, the nature of the felony – violent or non-violent—was simply not a factor in the Court's analysis.  *See also Beecher v. City of Tacoma*, 2012 WL 1884672, at *7 (W.D.Wash. May 23, 2012) ("seriousness of [plaintiff's] suspected crime[,] . . . burglary and/or possession of a stolen vehicle[,] . . . weigh[ed] slightly in favor of the government[]"); *Bustamante v. Gonzalez*, 2010 WL 396361, at *6 (D.Ariz. Jan. 29, 2010) (severity-of-the-crime factor weighed in the government's favor where it was "undisputed that Plaintiff was suspected of the serious crime of residential burglary[]").

Despite Plaintiff's urging, *Beaver v. City of Federal Way*, 507 F.Supp.2d 1137 (W.D.Wash. 2007), *aff'd on other grounds*, 301 Fed.Appx. 704 (9th Cir. 2008), the other case upon which he heavily relies, does not support a finding that the severity of the

crime factor tips in his favor. The *Beaver* court did observe that a "felony offense, is not necessarily a violent crime[]" in that "if often relies more on stealth than force." *Id*. at 1144. Significantly, however, the *Beaver* court did not definitively decide whether the severity of the crime factor favored either party. Instead, it merely opined that "the fact that Mr. Beaver was initially reported as fleeing a burglary without weapons, as opposed to a suspect fleeing a shooting or an assault, lessens the overall sense of danger surrounding the incident." *Id.*   Given that the Court sidestepped the severity of the crime issue,   *Beaver* does not advance Plaintiff's argument any.

In short, just as in *Chew*, the severity of crime factor tips in favor of defendant Brewer, albeit "only slightly[.]" *See Chew*, 27 F.3d at 1442.

### b.  Immediacy of the Threat?

The Ninth Circuit has repeatedly stated that "the most important" of the *Graham* factors "is whether the suspect posed an immediate threat to the safety of the officers or others." *Lal v. California*, 746 F.3d 1112, 1117 (9th Cir.) (citing, *inter alia*, *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc), *cert. denied*, 135 S.Ct. 455 (2014)). Nonetheless, as earlier mentioned, the *Graham* "factors are not exclusive and [the court] consider[s] the totality of the circumstances." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793-794 (9th Cir.), *cert. denied sub nom. Wyatt v. F.E.V.*, 135 S.Ct. 676 (2014) (citing *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). Plaintiff Mendoza therefore mistakenly asserts that "by itself" or "standing alone[,]" the immediacy of threat factor "requires" denying Defendants' motion. *See* Pl.'s Resp. (Doc. 109) at 10:19 (citation omitted); and Pl.'s Mot. (Doc.106) at 13:11 (citation omitted).

With that clarification, the Court will assess whether at the time Officer Brewer commanded Havoc to bite plaintiff Mendoza, he posed an immediate threat to the officers' safety. The immediacy of the "threat analysis must be based on objective factors and not merely 'a simple statement by an officer that he fears for his safety or the safety of others[.]'" *Nelson*, 685 F.3d at 880 (quoting *Deorle*, 272 F.3d at 1281). "[A]n officer's use of force must be objectively reasonable based on his contemporaneous knowledge of

the facts." *Deorle*, 272 F.3d at 1281; *see also Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1232-1233 (9th Cir. 2013) (citing *Graham*, 490 U.S., at 396) (Court could "only consider the circumstances of which Deputies . . . were aware when they employed deadly force."); *Glenn*, 673 F.3d at 873 n. 8 (citing *Graham,* 490 U.S., at 396) (courts "cannot consider evidence of which the officers were unaware"). Additionally, in assessing "whether a reasonable jury would necessarily find that [defendant Brewer] perceived an immediate threat of death or serious physical injury" when he commanded Havoc to bite plaintiff Mendoza "requires [the Court] to consider exactly what was happening when" that command was given. *See Gonzalez*, 747 F.3d at 794.

Defendant Brewer frames his immediacy of the threat argument in terms of his knowledge, or lack thereof, of certain facts. *See* Mot. (Doc. 102) at 10:6-24. Based upon that purported knowledge, Brewer posits that he "was entitled to assume that Plaintiff posed an immediate threat to his and the other officers' safety." (*Id.* at 11:10-11). This argument is tenuous at best. The Court has serious reservations as to the propriety of assuming the immediacy of the threat. Putting that concern aside, the Court will not make such an assumption because defendant Brewer has not shown the requisite factual underpinnings for such an assumption.

Defendant Brewer's repeated assertions about what he did and did not know at the time of the encounter demonstrate his awareness of the importance of establishing his contemporaneous knowledge. *See* Defs.' Mot. (Doc. 102) at 10. Nevertheless, in discussing the second *Graham* factor, Officer Brewer did not cite to anywhere in the roughly 265 page record showing that he had contemporaneous knowledge of any of the facts upon which he is relying. This is concerning because on the record as presently constituted Officer Brewer was in weekly K-9 training when Sergeant Aponte gave the initial SWAT briefing. *See* DSF, exh. E (Doc. 103-1) at 42.

It was only after Sergeant Aponte learned, for instance, that Plaintiff had fled in his vehicle and had driven through a Home Depot parking lot at a high rate of speed, that Aponte contacted Officer Brewer and another officer who were in K-9 training and

- 23 -

"requested their assistance." *See* DSF, exh. E (Doc. 103-1) at 42.  Certainly Officer Brewer could have gained the knowledge Defendants attribute to him in their motion other than through the SWAT briefing, but  in the absence of record cites, there is no way to ascertain of what facts Officer Brewer had contemporaneous knowledge and when he gained that knowledge.  His IR, written the day after the execution of the search warrant, sheds no light on the issue of Officer Brewer's contemporaneous knowledge.

Moreover, when defendant Brewer did provide a cite, it was to case law.  To illustrate, Brewer asserts that he "knew that [Plaintiff] had the opportunity to become armed." Mot. (Doc. 102) at 10:18-19 (citing, *inter alia*, *Miller*, 340 F.3d at 965).  Again, how and when did Officer Brewer gain that knowledge?  He did not cite to any record evidence or in any way explain.  Citing, as he does, to three cases, does not establish Officer's own knowledge of this supposed opportunity.  Nor do defendant Brewer's unsupported assertions, such has plaintiff Mendoza "had access to weapons," lend credence to his argument that Plaintiff posed an immediate threat to defendant Brewer, his colleagues, or both.  *See* Reply (Doc. 121) at 13.

Plaintiff Mendoza rebukes Officer Brewer for relying upon his "subjective belief" that Mendoza posed an immediate threat to the officers' safety.  *See* Pl.'s Resp. (Doc. 109) at 8:27 (emphasis omitted).  Instead, from plaintiff Mendoza's perspective, "the objective facts – which are largely undisputed – demonstrate that [he] posed little if any threat." (*Id.* at 9:1-2) (emphasis omitted).  Like defendant Brewer, plaintiff's Response does not include any cites to the record when discussing the second *Graham* factor.  *See* Resp. (Doc. 109) at 8:20-10:20.[14]  Plaintiff Mendoza's motion does, however.

There, among the undisputed facts to which Plaintiff refers, are cites to several excerpts from Officer Brewer's deposition testimony.  In response to a litany of questions, Officer Brewer made a number of concessions showing that plaintiff Mendoza did not threaten to and did not use physical force of any kind.  Officer Brewer conceded that

---

[14]     Indeed, there are only four cites to the factual record in Plaintiff's response, and none pertain to the immediacy of threat issue.

Mendoza did not hurt Brewer or Havoc either before or after Havoc bit Mendoza. PSF, exh. A thereto (Doc. 107-1) at 4. When asked whether he reported that plaintiff Mendoza ever attacked, injured, assaulted, harmed, intimidated, threatened, was combative, jumped on, punched, struck, kicked, slapped, or attempted to be violent against him or anyone else, each time Officer Brewer answered negatively. *Id.*; Pl.'s Second SOF, exh. P (Doc. 119) at 7. This explains the fact that no mention is made of any of the foregoing in Officer Brewer's IR. (*See id.*). Sergeant Aponte testified similarly at his deposition. Sergeant Aponte agreed that nowhere in his IR did he indicate that plaintiff Mendoza intimidated, threatened, jumped on, punched, struck, kicked, slapped, or charged anyone. *See* PSF, exh. D (Doc. 107-1) at 28.

Nonetheless, defendant Brewer persists in arguing that he "and the other officers, including Sergeant Aponte, witnessed and documented not only the objective, but undisputed, facts which would have led any officer to believe that Plaintiff posed an immediate threat to their safety." Defs.' Reply (Doc. 121) at 7:1-4 (citations and footnote omitted). Defendant Brewer does not identify those "undisputed [ ] facts[,]" and where, specifically, they were documented. (*See id.* at 7:2). Instead, he simply cites to 46 paragraphs in DSF and Defendants' Response to PSF. Comparison of the cited paragraphs to the corresponding paragraphs in Plaintiff's several statements of facts readily discloses that these facts are not all "undisputed," as defendant Brewer claims.

One of the most significant of the disputed material facts is the placement of plaintiff Mendoza's hands. Officer Brewer and Mendoza directly contradict each other on this point. In his IR prepared the day after the incident, among other things, Officer Brewer wrote:

> As Havoc reached the shed, I could feel in the lead that Havoc's behavior began to change indicating he was in odor. At that time, . . . Mendoza[] swung open the doors to the shed without being instructed. The area was illuminated by one of the SWAT Team members, and I observed . . . Mendoza *squatting just inside the shed* and his *hand could not be seen.* Directly to the left of . . . Mendoza were multiple lawn tools (shovel, hoe and rake). Commands were given for . . Mendoza to show his hands, but was [sic] met with negative results. Due to . . . Mendoza's position, his locations [sic] to

the lawn tools and him not complying, I instructed Havoc to bite him.  Havoc bit . . . Mendoza on his left forearm.

DSF, exh. M (Doc. 103-1) at 81-82 (emphasis added).

At his deposition, taken about two years after the incident, defendant Brewer testified that as Havoc was about to sniff the shed, "[t]he doors were abruptly thrown open, scared [Brewer], scared probably the guys on the swat team because of that behavior and I have Havoc the command to bite" Plaintiff.  DSF, exh. O (Doc. 103-1) at 94:18-22.  At the same time though, as he acknowledged during his deposition, Officer Brewer did not mention in his IR that he was in fear of his life or in fear for the lives of his colleagues.  (*Id.* at 94:3-9).  Of course this statement, which appears to be a post-hoc rationalization, is not enough to establish that Officer Brewer feared for his safety or that of others.  What is more, Officer Brewer agreed that Mendoza did not come out of the shed, running, charging or attacking Brewer or Havoc.  (*Id.* at 90:21-25).  Officer Brewer also agreed that Mendoza actually did not use the law tools against anyone.  PSF, exh. A (Doc. 107-1) at 9.

Plaintiff' Mendoza's version of the facts is at odds with Officer Brewer's.  At his deposition, Plaintiff testified that when he saw the officer looking at the shed, he "decided to come out." Pl.'s Resp. DSF, exh. L (Doc. 110-1) at 39.  When questioned about the sequence of events as he came out of the shed, Plaintiff Mendoza testified that before coming out of the shed, he said, "'I'm right here.'"  (*Id.*)  Plaintiff. Mendoza also testified that he opened both doors of the shed, using his hands.  (*Id.* at 39-40).  Further, when he said, "I'm right here," Mendoza claims to have done so with his hands up.  (*Id.* at 40).  Plaintiff Mendoza and Officer Brewer thus offer competing versions of what transpired during this brief time frame.

There is also a factual dispute as to the lighting in the backyard when Officer Brewer and the others were searching for Plaintiff.  Sergeant Aponte testified that no lights were used because the officers did not way to "give[] [their] position away[,]" DSF, exh. O (Doc. 103-1) at 91, whereas plaintiff Mendoza claims that he could see the

- 26 -

officers' flashlights as they entered the backyard. Pl.'s Resp. DSF, exh. L (Doc. 110-1) at 8. When, how and the extent to which the backyard may or may not have been lighted, is a consideration in terms of what both Officer Brewer and Plaintiff could see during the relevant time frame.

Crediting plaintiff Mendoza's version of events, that is, that he was quietly in the shed throughout the SWAT team' search of his residence and backyard, and that he came out of the shed on his own volition, with his hands up, stating, "I'm right here," a reasonable jury could find that at that point, he was not an immediate threat to the safety of Officer Brewer or others. On the other hand, crediting Officer Brewer's version of events, including that plaintiff Mendoza was squatting inside the shed, his hands could not be seen, he was near lawn tools, and he did not comply with commands to show his hands, a reasonable jury could find that Mendoza did pose an immediate threat to the safety of at least defendant Brewer, and perhaps the other officers.

In sum, there are several material factual disputes, the position of plaintiff Mendoza, including his hands, when Officer Brewer gave the bite order, being the most significant. As in *Coles*, 704 F.3d 624, this "dispute is material because it goes to the heart of the threat that" defendant Brewer and perhaps the other officers "faced at the moment" Officer Brewer commanded Havoc to bite plaintiff Mendoza. *See id*. And, just as in *Coles*, "its resolution rests entirely on whose version of the story a fact-finder deems more credible." *See id.* The Court thus finds that the single most important *Graham* factor – the immediacy of the threat – is neutral.

### c. Actively Resisting or Attempt to Evade Arrest?

"The third *Graham* factor asks whether [plaintiff Mendoza] was 'actively resisting arrest or attempting to evade arrest by flight' and whether 'any other exigent circumstances . . . existed at the time of the arrest.'"[15] *See Coles*, 704 F.3d at 629 (quoting *Deorle*, 272 F.3d at 1280 (internal quotation marks omitted)). The Ninth Circuit

---

[15] The Court is keenly aware that there was no arrest warrant for Plaintiff, only a search warrant for his residence. However, because the *Graham* Court framed the factor in this way, this Court will not deviate.

views resistance on a continuum.  At one end is "'the purely passive protestor who simply refuses to stand,'" and on the other is "'the individual who is physically assaulting the officer.'"  *Nelson*, 685 F.3d at 881 (quoting *Bryan*, 630 F.3d at 830).  "'[T]he level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.'"  *Gravelet-Blondin*, 728 F.3d at 1091 (quoting *Bryan*, 630 F.3d at 830).

In arguing that plaintiff Mendoza was evading arrest, Defendants contend that  he was continually fleeing, from the time the PPD first employed its emergency lights, "right up to the point that [Havoc] was about to alert the officers of his presence in the shed." Def.'s Mot. (Doc. 102) at 11:15-16 (citations omitted).  During this time, among other things, Defendants note that Plaintiff abandoned his car, ran home and hid from the PPD while they were searching of his residence.  Thus, from the officers' perspective, Plaintiff gave no indication of surrendering or otherwise complying with their orders "when he flung open the doors to the shed." (*Id.* at 11:19).  And, Defendants continue to maintain that Plaintiff's "hands were hidden." (*Id.* at 11:20).

Plaintiff's view of the relevant time frame is narrower.  Plaintiff focuses strictly upon what was transpiring when defendant Brewer ordered Havoc to bite Plaintiff. Plaintiff Mendoza devotes his response to an argument based entirely upon *Chew*, 27 F.3d 1432.  More specifically, Plaintiff is relying upon the following passage from *Chew*:

> With respect to whether Chew was 'actively resisting arrest,' it is undisputed that he fled and then hid from the police. He did not, however, resist arrest to the point of offering any physical resistance to the arresting officers, nor, at the time the officers released the dogs, did they have any particular reason to believe that he would do so. With respect to whether he was attempting to evade arrest by flight when Volker was released, the answer is yes and no. In a general sense he was, but in more precise terms his flight had terminated, at least temporarily, in the scrapyard.

*Chew*, 27 F.3d at 1442.  Plaintiff Mendoza asserts that his situation is "nearly identical, and no different than *Chew*[.]"  Pl.'s Resp. (Doc. 109) at 11:12.  Therefore, wholly relying upon *Chew,* Plaintiff argues that "the third *Graham* factor does *not* support Defendants'

- 28 -

entitlement to summary judgment." (*Id.* at 11:12-13) (citation omitted) (emphasis added).

It is puzzling why plaintiff Mendoza is urging this Court to follow *Chew* because immediately after the above mentioned quote, the Ninth Circuit explicitly found, "[s]till, a *slight edge* goes *to the government* on this score." *See Chew,* 27 F.3d at 1442 (emphasis added). Consequently, following *Chew* would mean that this factor would weigh in defendant Brewer's favor, not in plaintiff Mendoza's favor. It is equally puzzling why defendant Brewer goes to some lengths to distinguish *Chew*, never mentioning that the Court in *Chew* found that the third *Graham* factor favored the government, if only slightly.

Regardless, *Chew* is not controlling primarily because, unlike the present case, there were no issues of surrender or non-compliance. Here, plaintiff Mendoza maintains that he "was not resisting or attempting to evade arrest[.]" Pl.'s Mot. (Doc. 106) at 14:9 (emphasis omitted). Rather, when Officer Brewer commanded Havoc to bite, Plaintiff claims that he "was attempting to surrender[,]" adding that at that point he also "was surrounded by police[.]" (*Id.* at 14:17); Pl.'s Resp. (Doc. 109) at 10:22 (emphasis omitted). To the contrary, defendant Brewer asserts that "where all of Plaintiff's prior actions were consistent with noncompliance, [he] and the SWAT team had every reason to believe that Plaintiff was ***not*** surrendering by throwing open the doors to the shed, crouching down, and not showing his hands." Defs.' Resp. (Doc. 112) at 13:10-13 (emphasis in original). The parties' assertions regarding surrender each assume that there are no genuine issues of material fact,[16] but in analyzing the immediacy of the threat, this Court found otherwise.

---

[16]    The starting point for Plaintiff's summary judgment motion as to the third *Graham* factor is what he deems to be an admission that he was not resisting arrest. The basis for this purported admission is a "release questionnaire" by Detective Ebert, who evidently was not there at the execution of the search warrant. PSF, exh. I (Doc. 107-1) at 83:23. From the snippet of Detective Ebert's deposition testimony Plaintiff provided, it appears that the Detective "checked" a space on that questionnaire indicating that plaintiff Mendoza "did not resist arrest[.]" (*Id.* at 84:1-2). Because the record is not fully developed on this issue, this purported admission falls to the wayside at this juncture.

Not only that, but in *Chew*, "at the time the officers released the dogs," the Ninth Circuit found that the officers did not "have any particular reason to believe" that the plaintiff would "offer[] any physical resistance to the arresting officers[.]" *Chew*, 27 F.3d at 1442. Unlike *Chew*, there is a dispute as to whether Officer Brewer had "any particular reason to believe" that plaintiff Mendoza would offer physical resistance. This dispute arises partly because, as previously discussed, plaintiff Mendoza and Officer Brewer differ as to Mendoza's position when Brewer gave the bark order. Thus, under these circumstances, the Court cannot find that "a slight edge goes to the government[.]" *See Chew*, 27 F.3d at 1442.

What the Court can find is that a "slight edge goes" to plaintiff Mendoza. This is because in *Nelson*, 685 F.3d 867, upon which plaintiff Mendoza heavily relies, the Ninth Circuit reiterated "that a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Id.* at 881. The Ninth Circuit has so held under a variety of circumstances "where the extent of the resistance was substantially greater" than plaintiff Mendoza's failure to respond to an unspecified number of commands to raise his hand. *See id.* (citing *e.g.*, *Young*, 655 F.3d at 1165–66 (arrestee's repeated refusal to reenter vehicle at officer's command is not active resistance); *Bryan*, 630 F.3d at 829–30 (arrestee's cursing and muttering to himself and exiting his vehicle despite being told to stay in car was not active resistance); *Davis* [*v. City of Las Vegas*, 478 F.3d [1048][,] 1055–56 (9th Cir. 2007) (arrestee's actions in physically impeding the officer's search of his pockets was not active resistance); *Smith*, 394 F.3d at 703 (arrestee's refusal to remove hands from pockets and his reentry of his home despite officers' orders to place hands on head and walk towards them was not active resistance); *Headwaters* [*Forest Defense v. County of Humboldt*], 276 F.3d 1125, 1130 [(9th Cir. 2002)] (protestors that remained seated and used "black bear" devices to lock themselves to one another despite officers' orders to disperse did not actively resist)).

The *Nelson* Court also reiterated that "active resistance is not to be found simply

because of a failure to comply with the full extent of an officer's orders." *Nelson*, 685 F.3d at 882. "To the contrary, where an individual's 'resistance was [not] particularly bellicose," the Ninth Circuit has "held that various applications of force, including the use of pepper spray, . . . , and bean bag projectiles, . . . were not reasonable." *Id.* (citations omitted). Accepting defendant Brewer's version of events, that is, that plaintiff Mendoza was crouching in the shed, near lawn tools, his hands could not be seen, and he had not complied with an unspecified number of commands to show his hands, "it does not appear that [he] was particularly bellicose or that he showed any signs of fleeing the area." *See Smith*, 394 F.3d at 703. The same is true accepting plaintiff Mendoza's version of events. As a result, the third *Graham* factor slightly favors plaintiff Mendoza.

### 3. Other Factors

In examining the totality of the circumstances, beyond the three *Graham* factors, the Court may "consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Mattos*, 661 F.3d at 441 (internal quotation marks and citations omitted). Here, Officer Brewer's failure to give a warning before ordering Havoc to bite is the dominant other non-*Graham* factor, as the parties' memoranda evince. "[T]he absence of a warning of the imminent use of force, when giving such a warning is plausible, weighs in favor of finding a constitutional violation." *Gravelet-Blondin*, 728 F.3d at 1092 (citing, *Mattos*, 661 F.3d at 451; *Deorle*, 272 F.3d at 1283–84). "Appropriate warnings comport with actual police practice and such warnings should be given, when feasible, if the use of force may result in serious injury." *Glenn*, 673 F.3d at 876 (quotation marks and citation omitted).

The PPD has a Policy for the use of "Police Service Dogs" and a more general "Use of Force" Policy. *See* PSF, exh. E (Doc. 107-1) at 32-41; and exh. J (Doc. 107-1) at 86-91. The former states, in part, that when "[s]earching buildings for criminal suspects[,] . . . the handler will direct a verbal warning (in English and the equivalent in Spanish) to the interior of the building, notifying any potential suspects inside to come out immediately or a police service dog will be deployed and once the police service dog

locates them, they may be bitten." (*Id.*, exh. E (Doc. 107-1) at 32, Policy 4.26, ¶ IV(A)(2); and at 33, ¶ IV b)).  The Policy sets forth the precise warning to be given.  Further, the Policy states that "[a]fter a reasonable time lapse without a response, the policy service dog will be deployed." (*Id.*, ¶ c)).

Given this Policy and Use of Force Policy, plaintiff Mendoza strongly implies that the Court should find in his favor on the failure to warn factor because it is undisputed that defendant Brewer never gave any kind of warning prior to ordering Havoc to bite.  While the Court "may . . . consider" these PPD Policies "when evaluating whether" defendant Brewer's "use of force is constitutionally unreasonable[,]" they "are not dispositive." *See  Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003).  This is especially so with respect to the PPD's Police Service Dogs Policy.  The effective date of the Policy which is part of this record is September 25, 2012 -- more than a year and a half *after* the PPD's execution of the search warrant on Plaintiff's residence.  *See* PSF, exh. E (Doc. 107-1) at 33.

Hence, the Court next turns to the parties' feasibility arguments.  Defendant Brewer contends that it was not feasible or plausible for him to give a "canine warning in the split second that Plaintiff emerged from the shed."  Def.'s Mot. (Doc. 102) at 13:5-6 (citation omitted).  Disagreeing, plaintiff Mendoza retorts that "[t]here was sufficient time to give a warning[,]" so the failure to warn "is particularly egregious because when [he] opened the shed Brewer immediately ordered his canine to bite[.]"  Pl.'s Resp. (Doc. 109) at 12:10 and 12:21-22 (emphasis omitted).

These arguments are troubling in that they are at variance with, and thus substantially weakened by, the factual record as presently constituted.  Officer Brewer conceded at his deposition that Plaintiff did not come running out of the shed; nor did he charge Brewer, or attack Brewer or Havoc.  DSF, exh. O (Doc. 103-1) at 90.  "[W]hen the [shed] doors [we]re thrown open," defendant Brewer further conceded that he "saw" Plaintiff "squatting[.]"  (*Id.*).  Sergeant Aponte's deposition testimony was nearly identical.  He also agreed that after opening the shed doors, Plaintiff did not "come out

- 32 -

charging[,]" or "attacking or assaulting the officers[.]"  PSF, exh. D (Doc. 107-1) at 30. Sergeant Aponte agreed, instead, plaintiff Mendoza was "[d]own, . . . crouching or squatting[.]"  (*Id.*)  Sergeant Aponte further agreed that while Plaintiff was hiding in the shed, he did not hurt any officer or Havoc. (*Id.*)  Sergeant Aponte also agreed that Mendoza did not hurt any person or Havoc. (*Id.*)  This factual scenario appreciably undermines defendant Brewer's contention that it was not feasible to give a warning prior to ordering Havoc to bite because purportedly this was a "split second" judgment situation "escalated" by plaintiff Mendoza.  *See* Def. Resp. (Doc. 112) at 14:1.

Plaintiff's argument is correspondingly weak.  In his motion, plaintiff Mendoza claims that he "*never moved* and was merely squatting[.]"  Pl.'s Mot. (Doc. 106) at 17:4 (emphasis added).  However, during his deposition, plaintiff Mendoza indicated that when he opened the shed doors, with his hands up, he said, "I'm right here[.]"  *See* Pl.'s Resp. DSF, exh. L (Doc. 110-1) at 8-9.  Plaintiff cannot have it both ways.

Notwithstanding these seeming inconsistencies, accepting plaintiff Mendoza's version of the facts, or accepting defendant Brewers' version, yields the same result.  It is undisputed that immediately after the order was given for Plaintiff to "[c]ome on out" of the shed, as can be heard on the audio clip (Pl.'s Second SSOF, exh. O), completely without warning, defendant Brewer gave Havoc the order to bite "ten-plus, probably[]" times.  Resp. (Doc. 109) at 12:21; PSF, exh. A (Doc. 107-1) at 7.  If, after the opening of the doors, plaintiff Mendoza was crouching or squatting down inside the shed, and was not, in any manner, moving towards defendant Brewer or Havoc, a warning such as that found in the PPD's Police Service Dog Policy, was feasible.  Therefore, defendant Brewer's failure to give any warning strongly militates against a finding that his use of force was reasonable.

The same can be said if, as Plaintiff Mendoza testified, he came out of the shed with his hands up, saying, "I'm right here."  *See* Pl.'s Resp. DSF, exh. L (Doc. 110-1) at 9. If anything, under these circumstances, the feasibility of a warning is even more apparent. Thus, under either factual scenario, the Court finds that defendant Brewer's failure to

warn prior to ordering Havoc "ten-plus, probably[]" times to bite plaintiff Mendoza strongly militates against a finding that Brewer's use of force was reasonable.

The parties only briefly touch upon the availability of less intrusive means of force, which is also relevant to reasonableness. This Court will limit its analysis accordingly.

"Police are required to consider [w]hat other tactics if any were available to effect the arrest." *Bryan*, 630 F.3d at 831 (internal quotation marks, citation and footnote omitted). "This does not disrupt the 'settled principle that police officers need not employ the least intrusive degree of force possible;' rather, it 'merely recognize[s] the equally settled principle that officers must *consider* less intrusive methods of effecting the arrest and that the presence of feasible alternatives is a *factor* to include in [the] analysis.'" *Hesterberg v. United States*, 2014 WL 5073716, at * 11 (N.D.Cal. Oct. 9, 2014) (quoting *Bryan*, 630 F.3d at 831 n. 15) (emphasis in original). Officers "need only act within that range of conduct [courts] identify as reasonable." *Glenn*, 673 F.3d at 876 (internal quotations and citation omitted). "However, police are required to consider [w]hat other tactics if any were available, and if there were clear, reasonable and less intrusive alternatives to the force employed, that militate[s] against finding [the] use of force reasonable." *Id.* (internal quotation marks and citations omitted).

Defendant Brewer maintains that "[w]hen Plaintiff flung open the doors to the shed, Havoc was the nearest, most effective, and least harmful means of force available." Defs.' Mot. (Doc. 102) at 13:17-18. Although Plaintiff claims that defendant Brewer "had many other options available to him" that would not have resulted in injury to him, he points to only two. Pl.'s Mot. (Doc. 106) at 15:25. More specifically, plaintiff Mendoza contends that defendant Brewer could have either "follow[ed] the PPD's . . . Use of Force Policy or . . . us[ed] the K-9 warning which is part of the PPD's Police Service Dog Policy. (*Id.* at 15:26-27). The latter "would have informed [Plaintiff] of the consequences" of "not immediately surrender[ing]." (*Id.* at 15:28).

Importantly, there is no indication that defendant Brewer considered any

- 34 -

alternatives. In fact, as can be heard on the audio recording, almost no time elapsed between the time the order to "come on out" was given and three commands to "fasse, fasse, fasse[,]" or bite, bite, bite were given. Thus, given the availability of at least one alternative, that is, giving a warning in accordance with the PPD's Police Service Dog Policy, this factor, too, weighs in plaintiff Mendoza's favor. *See Nelson*, 630 F.3d at 831 (where officer "apparently did not consider less intrusive means of effecting [the plaintiff's] arrest[,]" factored "significantly" into Court's *Graham* analysis).

Defendant Brewer's assertion that "a specific warning would have accomplished nothing more than [Plaintiff] already was aware of, the SWAT team was looking for him and they had a dog[]" is specious and does not change the Court's view. *See* Defs.' Resp. (Doc. 112) at 14:11-13. What a specific warning would have accomplished is to have clearly informed plaintiff Mendoza that if he did not respond to the PPD's order to come out of the shed, Havoc would be released and Havoc might bite Plaintiff. So, as with the absence of a warning, defendant Brewer's failure to consider less harmful alternatives, weighs in plaintiff Mendoza's favor.

### e. Balancing the Interests

The Ninth Circuit recently reaffirmed that because it "is inherently fact specific, the 'determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases.'" *Green*, 751 F.3d at 1049 (quoting *Headwaters*, 240 F.3d at 1205–06); *see also Torres v. City of Madera*, 648 F.3d 1119, 1125 (9th Cir. 2011) (summary judgment "in excessive force cases should be granted sparingly"); *Liston v. County of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir. 1997) (finding that excessive force is "ordinarily a question of fact for the jury"); *Chew*, 27 F.3d at 1443 ("[W]hether a particular use of force was reasonable is rarely determinable as a matter of law.")). This is not such a rare case, as should be readily apparent by now.

Balancing all of the factors discussed herein, and considering the totality of the circumstances, the Court cannot determine at this juncture that defendant Brewer's use of force against plaintiff Mendoza was reasonable as a matter of law. Conversely, the Court

cannot say that defendant Brewer's use of force was unreasonable as a matter of law. That is because, "as with most excessive force claims, the correct determination of the circumstances here will require a careful balancing of the evidence and the inferences that can be made therefrom." *Hayes v. Cty. of San Diego*, 736 F.3d 1228, 1236 (9th Cir. 2012). At this juncture, "the disputed facts and inference could support a favor for either party," rendering summary judgment in favor of either plaintiff Mendoza or defendant Brewer improper. *See Glenn*, 673 F.3d at 878. To grant summary judgment here would violate the well settled principles that courts "must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts[.]" *See Gonzalez*, 747 F.3d at 795 (internal quotation marks and citation omitted). **III.  Qualified Immunity**

### A.  Legal Standards

"An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "clearly established" at the time of the challenged conduct." *Plumhoff*, 134 S.Ct. at 2023 (quoting *Ashcroft v. al–Kidd*, 131 S.Ct. 2074, 2080 (2011)); *see also Tarabochia v. Adkins*, 766 F.3d 1115, 1121 (9th Cir. 2014) (quoting *Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) ("'Qualified immunity protects government officials from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") Qualified immunity "generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted). This doctrine "protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1244-1245 (2012) (internal quotation marks and citations omitted).

The qualified immunity "doctrine provides an immunity from suit rather than a defense to liability,  . . . , and ensures that 'officers are on notice their conduct is unlawful'

before being subjected to suit." *Tarabochia.* 766 F.3d at 1121 (quoting, *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) (citation omitted).  Therefore, "qualified immunity shields an officer from liability even if his or her action resulted from a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact[.]"  *Lal*, 746 F.3d at 1116. As such, "[q]ualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 134 S.Ct. 2369, 2381 (2014) (quoting, *al-Kidd*, 131 S.Ct., at 2085).    "In this way, the doctrine strikes a balance between 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Tarabochia*, 766 F.3d at 1121 (quoting, *Pearson*, 555 U.S., at 231); *see also Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012) (quoting, *Anderson*, 483 U.S., at 639) (quoting, *Davis v. Scherer*, 468 U.S. 183, 195 (1984)) ("This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can "reasonably anticipate . . . when their conduct may give rise to liability for damages."")

There is a two-step inquiry for determining whether an officer is entitled to qualified immunity in an excessive force case such as this.  First, a court "examin[e]s whether a Fourth Amendment violation occurred; second, [a court] look[s] to see whether the officer[] violated clearly established law." *Cameron v. Craig*, 713 F.3d 1013, 1020-1021 (9th Cir. 2013) (quoting, *Santos v. Gates*, 287 F.3d 846, 855 n. 12 (9th Cir. 2002) (other citation omitted).  "Either question may be addressed first, and if the answer to either is 'no,' then the officers cannot be held liable for damages." *Glenn*, 673 F.3d at 870 (citing, *Pearson*, 555 U.S. at 236).

In considering the constitutional violation prong, a court asks whether if "the facts alleged, taken in the light most favorable to the party asserting injury,  show the officer's conduct violated a constitutional right[.]"  *Green*, 751 F.3d at 1051 (internal quotation marks and citation omitted).  The second or clearly established law  prong itself "requires

two separate determinations[.]" *Green*, 751 F.3d at 1052. First, "whether the law governing the conduct at issue was clearly established[.]" *Id.* (citation omitted). Second, "whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law." *Id.* (citation omitted). "Both are questions of law to be determined by the court[,]" but only "in the absence of genuine issues of material fact." *See id.*; s*ee also Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (citing, *Brosseau v. Haugen*, 543 U.S. 194, 195, n. 2 (2004) (per curiam) (other citations omitted) ("[U]nder either prong [of the qualified immunity standard], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.")

Under the second qualified immunity prong, "an officer will be denied qualified immunity in a § 1983 action 'only if . . . the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood h[is] conduct to be unlawful in that situation.'" *Green*, 751 F.3d at 1051-1052 (quoting, *Torres*, 648 F.3d at 1123). "'This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful[.]'" *C.B. v City of Sonora*, 769 F.3d 1005, 1026 (9th Cir. 2014) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (internal quotation marks omitted)). "[I]ndeed, 'officials can still be on notice that their conduct violates established law even in novel factual circumstances[.]'" *Id.* (quoting *Hope*, 536 U.S. at 741). In other words, "[a] right can be clearly established despite a lack of factually analogous preexisting case law[.]" *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013) (citation omitted). Courts "should be 'particularly mindful of this principle in the context of Fourth Amendment cases, where the constitutional standard—reasonableness—is always a very fact-specific inquiry.'" *C.B.*, 769 F.3d at 1026 (quoting, *Mattos*, 661 F.3d at 442).

It is the plaintiff's burden to prove that "'the right allegedly violated was clearly established[.]'" *Tarabochia*, 766 F.3d at 1125 (quoting *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991)). A plaintiff need not "demonstrate the existence of a 'fundamentally similar' or 'materially similar' case[,]" though. *Kaady v. City of Sandy*,

- 38 -

2008 WL 5111101, at *15 (D.Or. Nov. 26, 2008) (quoting, *Hope*, 536 U.S., at 741).  The Supreme Court allows for "notable factual distinctions between the precedents relied on . . . so long as the prior decisions give reasonable warning that the conduct then at issue violated constitutional rights."  *Hope*, 536 U.S. at 740 (internal quotation marks and citation omitted).  "However, where there is no case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *City of Sonora*, 769 F.3d at 1026 (quoting *al–Kidd*, 131 S.Ct., at 2083); *see also Plumhoff*, 134 S.Ct. at 2023 (internal quotation marks and citations omitted) ("controlling authority" or a "robust consensus of cases of persuasive authority" create clearly established law).  Therefore, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Plumhoff*, 134 S.Ct. at 2023 (citing *al-Kidd*, 131 S.Ct., at 2080).

The Supreme Court has "'repeatedly told courts . . . not to define clearly established law at a high level of generality,' *al-Kidd*, 131 S.C. at 2074, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."  *Plumhoff*, 134 S.Ct. at 2023.  The crux of the second qualified immunity prong is "'whether a reasonable officer would have had fair notice that [the action] was unlawful[.]'"  *Tarabochia*, 766 F.3d at 1125 (quoting *Chappell*, 706 F.3d at 1056–57 (internal quotation marks omitted)) (other citation omitted).  This inquiry begins "'by looking to binding precedent[;] [i]f the right is clearly established by decisional authority of the Supreme Court or th[e] [Ninth] Circuit, [this Court's] inquiry should come to an end.'"  *Id.* (quoting *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004) (internal citations omitted)).  "In the absence of binding precedent clearly establishing the constitutional right," this Court "'look[s] to whatever decisional law is available . . . including decisions of state courts, other circuits, and district courts.'"  *See id.* (internal quotation marks omitted).  "Even 'unpublished decisions of district courts may inform [the] qualified immunity analysis.'"  *Drummond ex rel. Drummond v. City of*

- 39 -

*Anaheim*, 342 F.3d 1052, 1060 (9th Cir. 2003) (internal quotation marks and citation omitted). Finally, the clearly established right standard is "objective[,]"rendering "irrelevant . . . the defendant's subjective understanding of the constitutionality of his or her conduct is irrelevant." *Karl v. City of Mountlake Terrace*, 678 F.3d at 1073 (9th Cir. 2012) (internal quotation marks and citations omitted).

Defendant Brewer advances two theories as to why he is entitled to qualified immunity. First, essentially he argues that his actions were "objectively reasonable" under *Miller*, 340 F.3d 959, thus entitling him to qualified immunity. Defs.' Reply (Doc. 121) at 8: 22. Second, defendant Brewer urges this Court to adopt the courts' reasoning in *McKay v. City of Hayward*, 949 F.Supp.2d 971 (N.D.Cal. 2013), and *Fallis v. Sasaki*, 2011 WL 111724 (W.D.Wash. 2011), and find that he is entitled to qualified immunity on the discrete issue of failing to give a warning prior to commanding Havoc to bite Plaintiff. The Court will address these theories seriatim.

**B.  Excessive Force**

According to defendant Brewer, even if this Court finds that his conduct violated plaintiff Mendoza' Fourth Amendment rights, he is entitled to qualified immunity from liability. In one scant paragraph, defendant Brewer declares that he is entitled to such immunity because "it is undeniable that at least one reasonable officer could have, given the specific context of this case, concluded that . . . deploy[ing] Havoc was justified." Defs.' Mot. (Doc. 102) at 15:2-3. Defendant Brewer did not mention the clearly established law element of this affirmative defense.

To the contrary, focusing on the clearly established right element, as opposed to the reasonable belief element, plaintiff Mendoza argues that defendant Brewer is not entitled to qualified immunity because 20 years ago, in *Mendoza v. Block*, 27 F.3d 1357 (9th Cir. 1994)[17] the Ninth Circuit held that police officers use of a police dog to locate a fleeing suspect was subject to the Fourth Amendment's excessive force analysis.

---

[17]    To be clear, although they have the same last name, the plaintiff in *Block* and plaintiff Mendoza in the present case are different people.

- 40 -

Moreover, plaintiff Mendoza contends that defendant Brewer "violated clearly established law when he ordered his police canine to bite [Plaintiff] more than ten times without a sufficient justification." Pl.'s Resp. (Doc. 109) at 14:25-15:1. Plaintiff Mendoza also notes that since *Block,* "there have been sufficient decisions to give Brewer 'fair warning' that his conduct violated the Fourth Amendment." (*Id.* at 14:2-3 (citation omitted)). Lastly, given the existence of such case law, Plaintiff contends that defendant Brewer cannot claim that ordering Havoc to bite Plaintiff was a reasonable mistake of law.

In rejoinder, defendant Brewer contends that "*Miller*[, 340 F.3d 959] dictate[s] that [his] actions were objectively reasonable," and he and other police officers should be to rely upon *Miller.* Defs.' Reply (Doc. 121) at 8:21-22). Defendant Brewer thus maintains that there is "no clear basis" in "the case law" so "that every reasonable officer would have known beyond debate that ordering a dog to bite in this instance was unconstitutional." (*Id*. at 9:6-8 (citation omitted)).

The Court may begin with either part of the two-prong qualified immunity test. *Johnson*, 724 F.3d at 1168. Here, the Court will proceed, as did the parties, directly to the second prong where it asks whether defendant Brewer violated clearly established law.

### 1.  Clearly Established Law?

As Plaintiff emphasizes, in 1994 the Ninth Circuit unambiguously "h[e]ld that the deputies' use of the police dog is subject to excessive force analysis, and that this law is clearly established for purposes of determining whether the officers have qualified immunity." *See Mendoza*, 27 F.3d at 1362. Disregarding *Mendoza*, defendant Brewer contends that *Miller*, 340 F.3d 959, "is the closest, most recent case" Ninth Circuit case on point. Defs.' Reply (Doc. 121) at 8:20 (citation omitted). What is more, purportedly Miller "creates a constitutional standard" upon which police officers, such as defendant Brewer, should be able to rely. (*Id*. at 8:22).

In *Mendoza*, the Ninth Circuit recognized the paucity of case law at the time

- 41 -

pertaining to the use of police dogs.  That did "not mean, however, that there was no clearly established law that could indicate to the deputies that a constitutional right might be violated when using a dog during an arrest."  *Mendoza*, 27 F.3d at 1361.  The *Mendoza* Court began its analysis by finding that "[i]t is clearly established that '[t]he use of excessive force by police officers in an arrest violates the arrestee's Fourth Amendment right to be free from an unreasonable seizure.'"  *Id.* at 1362 (quoting *White v. Pierce County*, 797 F.2d 812, 816 (9th Cir. 1986)).  The Court then found that the factors employed in examining the reasonableness of force "appl[y] to any arrest situation where force is used, whether it involves physical restraint, use of a baton, use of a gun, or use of a dog."  *Id.*

Importantly, the Ninth Circuit clearly stated that it did "not believe that a more particularized expression of the law is necessary for law enforcement officials using police dogs to understand that under some circumstances the use of such a 'weapon' might become unlawful."  *Id.*  To illustrate, the Court found that "no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."  *Id.*  *Mendoza* demonstrates that the law surrounding the use of excessive force in the use of police dogs was clearly established at the time of the incident in February 2011.   Thus, applying *Mendoza* and construing the facts in the light most favorable to plaintiff Mendoza, the right to be free from the use of excessive force by a police canine was clearly established when defendant Brewer gave the bite order.

*Miller*, 340 F.3d 959, which defendant Brewer mentions in his reply, does not alter this conclusion.  Following a bench trial, the court held that a criminal suspect's Fourth Amendment rights were not violated where a sheriff's deputy "order[ed] a trained police dog to 'bite' and hold the suspect until officers arrived on the scene less than a minute later."  *Miller*, 340 F.3d at 960.  The Ninth Circuit affirmed.  Try as he might, defendant Brewer's attempts throughout his motion to analogize *Miller* to the present case are unpersuasive.   A few particularly significant factual differences between *Miller* and the

- 42 -

present case show why defendant Brewer's reliance thereon is misplaced.  Perhaps the most significant difference is that in *Miller* the deputy gave a warning that he was about to release a police dog -- a warning which the plaintiff ignored.

Other significant differences include the deputy's knowledge "that there was a chance Miller was not 'law enforcement friendly.'"  *Miller,* 340 F.3d at 965.  Also, the deputy "knew that Miller had possessed a large knife moments earlier, a fact that suggest[ed] Miller had had a propensity to carry a weapon (and perhaps a weapon more lethal than the one he had left behind)."  *Id.* (footnote omitted). And, the deputy "knew that there was a chance Miller had mental health problems."  *Id.*

Here, a warning was not given before Officer Brewer released Havoc to bite Mendoza.  Officer Brewer had no affirmative knowledge that plaintiff Mendoza had earlier possessed a weapon.  Further, there has been absolutely no suggestion that plaintiff Mendoza had any mental health problems.  Likewise, Officer Brewer never indicated that he was aware that Plaintiff was not "law enforcement friendly."  Thus, defendant Brewer's assertion that *Miller* "creates a constitutional standard" upon which police officers, such as defendant Brewer, should be able to rely[]" is disingenuous at best.  Defs.' Reply (Doc. 121) at 8:22.

### 2.  Reasonable Belief?

Next the Court "must . . . determine whether an officer, given the specific facts at issue, could have reasonably believed at the time that the force actually used was lawful under the circumstances." *Green*, 751 F.3d at 1052 (internal quotation marks and citation omitted).  "This requires [the Court] to look at what [defendant Brewer] knew at the time and whether it was sufficient to support a reasonable officer's belief that his actions were lawful." *Id.* (citing *Washington v. Lambert*, 98 F.3d 1181, 1193 (9th Cir. 1996)).  Just as in *Green*, while that issue is "generally a question of law to be determined by the court, there are disputed material facts here that prevent [this Court] from making such a finding at this juncture." *Id.* (citing, *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993) (explaining that determinations about the facts and circumstances within an

officer's knowledge and about the conduct underlying an alleged violation must be made by a finder of fact)).  The same disputed factual issues which preclude summary judgment on plaintiff Mendoza's excessive force claim preclude summary judgment on Officer Brewer's qualified immunity defense.  *See Glenn*, 673 F.3d at 870 (remanding where genuine issues of material fact existed as to whether officers' use of force violated plaintiff's Fourth Amendment rights, and finding that "resolution of these issues is critical to proper determination, on remand, of the qualified immunity defense); *see also Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008) (internal quotation marks and citation omitted) ("[I]f a genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial.")

For the reasons set forth above, the Court denies defendant Brewer's motion for summary judgment seeking qualified immunity on plaintiff Mendoza's excessive force claim.  The Court will proceed to the narrower issue of whether defendant Brewer is entitled to qualified immunity on the failure to warn aspect of plaintiff Mendoza's excessive force claim.

### C. Failure to Give Canine Warning

As the SAC alleges, one aspect of plaintiff Mendoza's excessive force claim is  the failure to issue a warning prior to commanding Havoc to bite.  *See* SAC (Doc. 7) at 7:15-17 (emphasis added) ("*Additionally*, Defendant Brewer's ordering Havoc to bite and hold on to [Plaintiff] was an improper and excessive use of force because Defendant Brewer ordered his police canine to bite [Plaintiff] without first issuing the earning required by [PPD] Policy 4.26.")  Essentially, defendant Brewer's premise is that at the time of the incident, the law was not clearly established that the failure to give a warning prior to ordering Havoc to bite Plaintiff was unlawful.  Therefore, based upon *McKay*, 949 F.Supp.2d 971, and *Fallis*, 2011 WL 111724, defendant Brewer is seeking qualified immunity on "the specific issue of canine warnings[.]"  Defs.' Reply (Doc. 121) at 8:23.

Plaintiff counters that defendant Brewer "violated clearly established law when he ordered [Havoc] to bite [Plaintiff] more than ten times without sufficient justification[,]"

but he did not address the more discrete issue of canine warnings. Pl.'s Resp. (Doc. 109) at 14:25-15:1.

Neither of the cases upon which defendant Brewer relies persuade the Court that he is entitled to qualified immunity on the issue of failure to give a canine warning. In *Fallis*, 2011 WL 111724, to which defendant Brewer merely cites, a person suspected of violating a protective order had fled on foot, at night, from police officers. Unable to apprehend and locate the fleeing subject, one of the defendant officers requested back-up. The defendants then "set up a containment perimeter of approximately three blocks around the area were Fallis might be hiding or continuing his flight." *Id.* at *2. After that the officers requested K-9 support to track and locate the plaintiff. "During the track," the canine "contacted [Plaintiff] by biting his leg and bringing him to the ground of the bushes wherein he had been hiding from the officers." *Id.* at *3 (citation omitted).

The *Fallis* Court addressed the issue, among others, of whether the plaintiff had a clearly established right to a warning "before the canine was released to bite and hold him until he was taken into custody." *Fallis*, 2011 WL 111724, at *11. Distinguishing between cases where the suspect is concealed, and those who are not, the *Fallis* Court held that at the time at the time of Plaintiff's arrest, October, 2006, the law was "*not* clear regarding *suspects*, who like Fallis, are *concealed* when contacted by a canine during an arrest." *Id.* at *12 (emphasis added). Thus, the Court "grant[ed] summary judgment on this *narrower* § 1983 excessive force issue in favor of Defendants." *Id.* (emphasis added).

As defendant Brewer recognizes, in *Fallis*, the Court "[f]ocus[ed] on the fact that the suspect was concealed[.]" Defs.' Mot. (Doc. 102) at 15:11-12 (citations and footnote omitted). In the present case, however, the facts taken in the light most favorable to Plaintiff show that he was not concealed when defendant Brewer ordered Havoc to bite. After he opened the shed doors, Plaintiff basically surrendered by putting his hands up and saying, "I'm right here." Pl.'s Resp. DSF, exh. L (Doc. 110-1) at 8-9. Given this important factual distinction, defendant Brewer's reliance upon *Fallis* is misplaced and

- 45 -

does not support defendant Brewer's claimed entitlement to qualified immunity.

Defendant Brewer fares no better in his reliance upon *McKay*, 949 F.Supp.2d 971. There, the police officers "were responding to a 'high priority' armed robbery" that had just occurred. *Id.* at 980 (citation omitted). The armed suspect had fled on foot, at night, into a residential community. While tracking the fleeing suspect, one of the defendants, a police canine handler, lowered the canine on a 33-foot leash over an eight-foot wall into the backyard of a private residence. The dog bit an 89-year-old resident who had no connection to the robbery. Defendants sought summary judgment, *inter alia*, on the excessive force claim based upon qualified immunity.

In responding to that motion, the plaintiffs "define[d] the constitutional right at issue as the right to be free from injury caused by a police dog deployed unseen into a residential area without a prior warning." *McKay*, 949 F.Supp.2d at 983 (citation omitted). Summarizing the divergent case law pertaining to warnings prior to deploying a police canine, the *McKay* Court wrote:

> [T]wo circuits have held that warnings are required before deploying a police dog. Three others have concluded that a prior warning is not dispositive of the reasonableness of seizing an individual with a police dog, and thus there is no clearly established right to be warned. District courts applying this precedent have been similarly split, depending on the circumstances of the seizure. The Court concludes that the law is not clearly established to put the individual officers here on notice that failing to give a warning before entering Mr. Porter's backyard was unlawful. The Ninth Circuit's consideration of verbal warnings as just one factor of many in its analyses of the reasonableness of such seizures supports this conclusion.

*Id.* at 984 (emphasis added). For these reasons, the *McKay* Court held that the defendant officers were entitled to qualified immunity on the plaintiffs' excessive force claim.

Relying upon the just quoted *McKay* rationale, defendant Brewer contends that "[b]ecause there is no clearly settled law in the *context of this case*," he is entitled to qualified immunity. Defs.' Mot. (Doc. 102) at 16:8-9 (emphasis in original). Despite defendant Brewer's contrary assertion, *McKay* is not dispositive "in the context of this case." *See id.* (emphasis omitted). Quite simply, that is because the present case does not

involve deploying a canine over a wall, "unseen into a residential area without a prior warning." *See McKay*, 949 F.Supp.2d at 983.  Thus, defendant Brewer's reliance upon *McKay* is unavailing.

More to the point, is *Dickinson v. City of Kent*, 2007 WL 1830744 (W.D.Wash. June 25, 2007), a case to which defendant Brewer also cites.[18]  There, two police officers instructed Plaintiff and the driver of a green pickup truck not to drive because they were intoxicated.  About an hour later, one of the defendant officers "was dispatched to investigate a possible DUI involving a stolen green pickup truck." *Id.* at *1 (citation omitted).  As the officer responded, the truck turned into a store parking lot, and was stopped when a defendant officer drove his patrol car in front of the truck.  The driver of the truck was less than cooperative in terms of leaving the truck, and was eventually handcuffed.  In the meantime, the Plaintiff, who was still intoxicated, disregarded orders to get out of the truck.  When one defendant officer managed to open the passenger door, another deployed a canine to "extract plaintiff from the pickup." *Id.*  (citation omitted).

Adhering to the settled qualified immunity framework, the *Dickinson* Court began its analysis of whether a warning is required before releasing a police dog by looking for binding Supreme Court and Ninth Circuit precedent.  Finding no such Supreme Court authority, *Dickinson* turned to Ninth Circuit excessive force cases involving police canines between 1994 and 2003.  Cataloging those cases, the *Dickinson* Court found that in five of those six Ninth Circuit cases, warnings were given before the deployment of the police canines.  Hence, the issue never arose as to whether there is a constitutional right to such a warning.  In the sixth case, *Chew*, 27 F.3d 1432, although the Ninth Circuit made no mention of a warning, the *Dickinson* Court found *Chew* distinguishable in that the suspect was concealed.  In light of the foregoing, the *Dickinson* Court further found that "[t]he Ninth Circuit has not expressly held that there is a right to a warning[]" before

---

[18]  Because *Dickinson*, 2007 WL 1830744 held that the law was clearly established that non-concealed suspects have a right to a warning before a police dog is released, so long as the officers' safety is not in jeopardy, the *Fallis* Court "adopt[ed] the . . . well-reasoned opinion" in *Dickinson* to reach the opposite conclusion. *Fallis*, 2011 WL 111724, at *12.

- 47 -

releasing a police dog to bite.  *Dickinson*, 2007 WL 1830744, at *6.

Therefore, in the absence of binding Supreme Court or Ninth Circuit precedent, the *Dickinson* Court "turn[ed] to . . . authority from other circuits."  *Dickinson*, 2007 WL 1830744, at *6.  It found that "since 1991 cases from other circuits have clearly established that when a suspect is not hiding, a warning is required before a police dog is released to bite."  *Id.*  After a comprehensive discussion of "persuasive out-of-circuit authority[,]" the *Dickinson* Court held that "if issuing a warning would not put the officers' safety in jeopardy, a non-concealed suspect has a right to a warning before a police dog is released to bite."  *Id.* at *8 (footnote omitted).  The Court further held that that "[t]his right is established clearly enough not to fall in the 'hazy border between excessive and acceptable force' sufficient to deny defendants' immunity defense on summary judgment, especially in a case where the dog is deployed to 'bite and drag' rather than just 'bite and hold.'" *Id*. (quoting *Saucier*, 533 U.S. at 206).  Although the *Dickinson* Court denied defendants' summary judgment on qualified immunity, it did so because the parties vigorously disputed whether a warning was given.

As *Dickinson* convincingly demonstrates, the right to the issuance of a warning prior to the deployment of a canine, where the suspect is not concealed, was clearly established in February 2011, when this incident occurred.  Thus, resolving all factual issues and drawing all reasonable inferences in Plaintiff's favor, there is no support for defendant Brewer's contrary assertion, *i.e.,* that the law was not clearly established  that failure to give a warning in these circumstances was unlawful.  The remaining question is "whether [a] reasonable officer also would have committed the act that the plaintiff[]s contend[s] is unconstitutional." *See Johnson v. Bay Area Rapid Transit Dist.,* 724 F.3d 1159, 1168 (9th Cir. 2013).  The Court cannot conclude that under Plaintiff's version of the facts -- that he was not concealed and had his hands up -- a reasonable officer would have deployed a canine, with no warning at all, to bite Plaintiff  probably ten plus times.  Therefore, defendant Brewer is not entitled to qualified immunity on the failure to warn aspect of Plaintiff's excessive force claim.

**C. City of Peoria**

In Count IV of the SAC, Plaintiff alleges that the City violated his Fourth Amendment rights by training its police officer canine handlers only in the "'Bite and Hold'" methodology, "regardless of the circumstances presented." SAC (Doc. 7) at 14, ¶ 115. The SAC further alleges that the "Bark and Hold" methodology trains police canines "to locate a suspect and continually bark and growl at the suspect[,] . . . effectively render[ing]" the suspect immobile until the suspect can be taken in to custody. (*Id.* at 13, ¶ 111). The "Bite and Hold" methodology which the PPD employs, however, "trains the police canine to locate a suspect and immediately bite the suspect and continue to bite them until the canine officer orders the canine to stop." (*Id.* at 13, ¶ 112). Based upon these allegations, the SAC further alleges that the City's "decision to train its officers in the Bite and Hold methodology only violates the Fourth Amendment because it directly leads to officers deploying their canines in such a manner that significant forces is used regardless of whether the circumstances make such use of force reasonable and appropriate." (*Id.* at 14, ¶ 116).

The City is arguing for "dismiss[al]" of this count positing that "the case law is unanimous that the 'Bite and Hold' method is constitutionally valid." Defs.' Mot. (Doc. 102) at 17:2; 16:15-16 (citations omitted). Plaintiff Mendoza did not respond to this particular defense argument. Instead, Plaintiff contends that the City should be held liable because it "ratified Brewer's use of force[,]" and such "ratification is chargeable to the municipality[.]" Pl.'s Resp. (Doc. 109) at 15:19 (internal quotation marks omitted). The crux of this ratification theory is that following the PPD's Use of Force investigation, the PPD found no issues with defendant Brewer's use of force and exonerated him. *See* Pl.'s Resp. DSF, exh. M (Doc. 110-1) at 22-23. This theory of liability is nowhere to be found in the SAC, however. Consequently, the Court agrees with the City; it is simply too late to raise this new theory of liability against it. *See Aspect Systems, Inc. v. Lam Research Corp.*, 2008 WL 2705154, at *10 (D.Ariz. June 26, 2008) ("Having not pleaded the existence or breach of oral agreements related to the 2004 agreement, Aspect may not

now, after the close of discovery, raise such alleged oral agreements as a basis of liability.") (citing *Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (same); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (same)); *see also McCarthy v. Barrett*, 804 F.Supp.2d 1126, 1145 (W.D.Wash. 2011) (too late to raise a new theory of liability in response to defendants' summary judgment motion).  Given that Plaintiff did not timely raise this new theory of liability against the City, the Court cannot properly consider it. What is more, because plaintiff Mendoza did not address the City's argument as to why it is entitled to summary judgment on Count IV of the SAC, as the City requests, the Court will deem Plaintiff's silence to be a concession to the validity of the City's argument.  *See* Reply (Doc. 121) at 10:4-5.  As a result, the Court grants summary judgment in favor of the City as to Count IV of the SAC.  Conversely, the Court denies Plaintiff's motion for summary judgment as to Count IV of the SAC.

### D.  State Law Tort Claims

The SAC, in Count I, alleges a battery claim against all defendants.  In Count II, it alleges a negligence and gross negligence claim also against all defendants.  Before addressing the parties' arguments as to these  state law tort claims, it should be noted, as mentioned at the outset, that pursuant to a joint stipulation, the City is the only remaining defendant as to these claims.  Disregarding this stipulation, the parties did not differentiate between the City and Officer Brewer.  The Court cannot ignore the parties' unequivocal stipulation, however.  They stipulated to, *inter alia*, dismissal without prejudice of Counts I and II against defendant Brewer.  Stip. (Doc. 15) at 2:1-4.  The parties further stipulated that such dismissal "shall" not "affect in anyway whatsoever" those two counts as against the City.  (*Id.* at 2:6-7).  In accordance with this stipulation, the Court will consider Plaintiff's tort claims as alleged against the City only.

Without distinguishing among the three tort theories of liability, the City

perfunctorily offers five reasons as to why it is entitled to summary judgment as to Plaintiff's tort claims. Three of those reasons demonstrate a fundamental misunderstanding of the relationship between a section 1983 claim for an alleged constitutional violation and state law tort claims. That these claims all arise out of the same set of facts is not, standing alone, a sufficient basis for dismissal of the tort claims. Alternative pleading is allowed under the Federal Rules of Civil Procedure and the pleading of claims under 42 U.S.C. § 1983 and state law tort claims is common practice. Equally misguided is the City's blunt assertion that Plaintiff has an adequate remedy under § 1983. Again, that alone does not prevent Plaintiff from asserting state law tort claims as well.

Finally, the City conflates the distinct concepts of respondeat superior liability, which is not available for § 1983 claims, with vicarious liability which is available for state law tort claims. As Plaintiff correctly states, "because a *Monell* claim or a claim for supervisory liability under § 1983 cannot rest on vicarious liability, does not somehow render [his] [s]tate [l]aw claims invalid[.]" Pl.'s Resp. (Doc. 109) at 16:7-9. Plaintiff Mendoza is permitted, as he stresses, to pursue his state law tort claims against the City because the City, as defendant Brewer's employer, could be held vicariously liable for those claims. *Cf. Kohler v. Inter-Tel Technologies*, 244 F.3d 1167, 1177 (9th Cir. 2001) (citation omitted) ("Liability of employers to third parties for acts of its employees is commonly referred to as 'vicarious liability.'"); *see also* Black's Law Dictionary 927 (10th ed. 2014) (defining "vicarious liability" as "[l]iability that a supervisory party (such as an employer) bears for the actionable conduct of a subordinate or associate (such as an employee) based on the relationship between the two parties.")

Turing to the merits of Plaintiff's tort claims, because neither party addressed Count I, his battery claim, for the time being this claim remains in the case. What the Court must consider at this time is the City's unadorned statement that "Arizona courts have established a common-law immunity from mere negligence by *police officers*." Defs.' Mot. (Doc. 102) at 14:6-8 (citations omitted) (emphasis added). Because, as just

explained, the City is the only remaining defendant as to Plaintiff's negligence claim, this argument is attributable to the City only.  This attribution is proper given that the relevant statute applies to both "public entit[ies]" and "public employees."  See A.R.S. § 12-820.02(A).

Citing first to *Hulstedt*, 884 F.Supp.2d 972, the City maintains that "Arizona state courts have established a common-law immunity from negligence for police officers." Defs.' Mot. (Doc. 102) at 14:6-8 (citing cases).  Implicit in this assertion is that the City has common law immunity from plaintiff Mendoza's negligence claim.  The *Hulstedt* Court wrote, "Arizona state courts have established a common-law immunity from mere negligence for police officers 'to assure continued vigorous police work.'" *Hulstedt*, 884 F.Supp.2d at 1017 (citing *Landeros v. City of Tucson*, 171 Ariz. 474, 475, 831 P.2d 850, 851 (App.1992) (quoting *Smith v. State*, 324 N.W.2d 299, 301 (Iowa 1982))).  On the basis of this statement alone, the *Hulstedt* Court granted summary judgment in favor of three defendants – two police officers and a detective – on Plaintiff's negligence claim.

Distinguishing *Landeros*, because it involved alleged negligence in a criminal investigation, in *Dominguez v. Shaw*, 2011 WL 6297971 (D.Ariz. Dec. 16, 2011), the Court declined to extend common law immunity where the alleged negligence arose in the context of the use of physical force in effectuating the plaintiffs' arrests.  Given *Dominguez*, plaintiff Mendoza asserts that the issue of common law immunity for "police negligence" is "at best presenting an undecided issue."  Pl.'s Resp. (Doc. 109) at 16:13. Plaintiff asserts that there is no need to resolve this issue because "regardless of whether a negligence or gross-negligence standard is applied," there are factual issues as to defendant Brewer's use of force, precluding summary judgment.[19] (*Id*. at 17:1-2).  The claimed existence of factual issues does not obviate the need for the Court to address the issue of common law immunity for negligence here.  If the City prevails on this

---

[19]    Completely contradicting that statement, and disregarding the joint stipulation, in the very next sentence Plaintiff claims that he is entitled to "partial summary judgment on his state law claims against Officer Brewer and the City[.]"  Pl.'s Resp. (Doc. 109) at 17:3-4 (citation omitted).

argument, Plaintiff could not go forward with his negligence claim against the City irrespective of disputed factual issues.

Close examination of cases within this District interpreting *Landeros* convinces this Court to adopt the reasoning in *Dominguez.* To be sure, the *Hulstedt* Court did grant summary judgment in favor of the defendant officers based upon *Landeros*, but it did not offer any rationale. With respect to one of the defendants in *Hulstedt*, the applicability of *Landeros* is easy to see. In *Hulstedt,* Plaintiff alleged that a defendant detective negligently prepared an affidavit. This theory of negligence fits squarely within *Landeros*' holding. In *Landeros,* the Court rejected a tort for "simple negligence in the investigation of a crime[,]" based upon the "public interest[.]" *Landeros*, 171 Ariz. at 475. Concurring with *Smith v. State*, 324 N.W. 299 (Iowa 1982), the *Landeros* Court found that "[t]he public has a vital stake in the active investigation and prosecution of crime." *Id.* (quoting *Smith*, 324 N.W.2d at 301). Given that "vital stake[,] . . . to assure continued vigorous police work," the *Landeros* Court further agreed, that "those charged with that duty should not be liable for mere negligence." *Id.* *Landeros* did recognize the possibility of a city's liability for the gross negligence of its police officers in investigating a crime.

As in *Dominguez,* this Court, too, finds that *Landeros* is distinguishable in that it does not "deal[] with alleged negligence in an investigation, but with alleged negligence in the use of physical force against Arizona citizens." *See Dominguez*, 2011 WL 6297971, at *2. This Court further agrees that "[t]he public has an interest in ensuring that police officers do not use more force than is justified against their citizens, even if excessive force is applied as the result of a mistake in judgment." *See id.* Finding that *Landeros* did not control[,]" the *Dominguez* Court soundly reasoned:

> Arizona's legislature expressly determined that public entities and officials acting within the scope of their employment are not liable for the actions detailed in A.R.S. § 12–820.02(A) unless the conduct was intentional or grossly negligent. The enumerated actions in A.R.S. § 12–820.02(A) do not include a public employee's use of force. The legislature did not elect to place use of force into the narrow exceptions granting

qualified immunity, and it is not [the Court's] place to override this decision. . . .

*Id.* at *3 (citation omitted). Adopting this reasoning, the Court declines to grant summary judgment on the basis of common law immunity to the City on the negligence aspect of Count II. Moreover, the factual issues identified herein also preclude granting summary judgment in Plaintiff's favor as to negligence.

Insofar as the gross negligent aspect of Count II is concerned, Plaintiff contends that "no reasonable juror could conclude anything other than Brewer was grossly negligent." Pl.'s Mot. (Doc. 106) at 17:16-17. Again, factual issues preclude such a finding at this juncture. Thus, summary judgment is not appropriate in favor of either the City or the Plaintiff as to the gross negligence aspect of Count II.

For the reasons set forth herein,

**IT IS HEREBY ORDERED:**

(1)    **DENYING** Defendants' Motion for Summary Judgment (Doc. 102) as to Counts I, II, and III of the Second Amended Complaint; and **GRANTING** Defendants' Motion for Summary Judgment (Doc. 102) as to Count IV of the Second Amended Complaint;

(2)    **DENYING** without prejudice Defendants' Motion to Exclude Expert Testimony (Doc. 104);

(3)    **DENYING** without prejudice Plaintiff's Motion to Exclude Defendants' Canine Expert Brad Smith (Doc. 105); and

(4)    **DENYING** Plaintiff's Motion for Partial Summary Judgment in its entirety (Doc. 106).

**Dated** this 20th day of March, 2015.

Honorable Diane J. Humetewa
United States District Judge

- 54 -